**ROSEBUD SIOUX TRIBE, Appellant,**

v.

**A & P STEEL, INC., Appellee.**

**Nos. 83–1748, 82–2187 and 82–2217.**

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 9, 1984.

Decided April 25, 1984.

Rehearing and Rehearing En Banc
Denied June 4, 1984.

---

**10.** Blair died, apparently by suicide, prior to the    defendants' trial.

Franklin J. Wallahan of Wallahan Law Offices, Rapid City, S.D., David A. Gerdes of May, Adam, Gerdes & Thompson, Pierre, S.D., for appellee A & P Steel, Inc.

Before HEANEY, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and BRIGHT, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

The plaintiff,[1] the Rosebud Sioux Tribe (Tribe), sued the defendant, A & P Steel, Inc. (A & P), in United States District Court for the District of South Dakota.[2] The suit sought damages for fraud, conspiracy, breach of contract and breach of warranties arising out of a contract for the development of an irrigation system on land owned by the Tribe.[3] The jury returned a verdict for A & P. A judgment dismissing the Tribe's complaint, and awarding over seventy-four thousand dollars to A & P on its counterclaim, was entered on August 27, 1982. The Tribe filed a timely notice of appeal with this court, and A & P cross-appealed.

On December 29, 1982, the Tribe filed a motion for relief from judgment pursuant to *Fed.R.Civ.P.* 60(b). The trial court denied the motion on May 16, 1983, and the Tribe appealed this denial. The Tribe's appeal from the underlying action, A & P's cross-appeal, and the Tribe's appeal from denial of the 60(b) motion were consolidated. This court heard oral argument on January 9, 1984. We reverse the denial of the 60(b) motion, and we remand for a new trial consistent with this opinion.

I. Facts.

a. The Parties.

In 1977, the chairperson of the Tribe, Edward Driving Hawk, contacted the attor-

Charles Rick Johnson, Johnson, Eklund & Davis, Gregory, S.D., J.M. Grossenburg, Day, Grossenburg & Whiting, Winner, S.D., for appellant.

1. Initially, the plaintiffs were enrolled members of the Tribe, suing on behalf of the Tribe, alleging a conspiracy and collusion between Tribal officials and the defendant to defraud the Tribe and its members of grant monies assigned to the Tribe for the purpose of installing a large scale irrigation project on Tribal lands. Later the Rosebud Sioux Tribe, after a Tribal election, sought to intervene. This motion was granted by the trial court, and the individual parties were later dismissed as unnecessary parties.

2. The Honorable Andrew W. Bogue, United States District Court for the District of South Dakota.

3. The funds made available by a grant for the project amounted to $2,063,380.00.

512

ney for Tribal Land Enterprises (TLE), Michael Strain. Richard Lone Dog was the chairperson of TLE. TLE is a subsidiary of the Tribe, but it is a separate corporation with different stockholders, and it is responsible for the administration of all land owned by the Tribe. Driving Hawk sought Strain's assistance in obtaining funds for irrigation development under the Emergency Drought Assistance Act of 1977, Pub.L. No. 95–18, 91 Stat. 36 (1977). Attorney Strain was, in fact, instrumental in securing a grant which ultimately exceeded two million dollars.

After preliminary negotiations with various companies, the Tribe, through Driving Hawk, and A & P, through its vice-president, Don McPherson, began contract negotiations. On June 21, 1977, Charles Colombe, a member of the Tribal Council, drafted and presented a resolution which authorized Driving Hawk to negotiate and enter into a contract for the construction of an irrigation system. The Tribal Council unanimously adopted the resolution. Attorney Strain drew up the contract which was signed by both parties on June 21, 1977. Driving Hawk issued a "notice to proceed" on the same day, and A & P began construction on the project.

Attorney Strain formed a dummy corporation, Frontrunner Associates, Inc., on July 13, 1977. This corporation received payments from A & P, and made payments to Driving Hawk and Lone Dog as set out in the following chart.

Payments to Frontrunner from A & P

| Date | Amount |
| --- | --- |
| July 19, 1977 | $13,000.00 |
| Aug. 8, 1977 | 16,673.47 |
| Aug. 22, 1977 | 14,723.47 |
| Oct. 3, 1977 | 37,562.12 |
| Oct. 24, 1977 | 25,526.19 |
| Nov. 4, 1977 | 22,276.19 |
| Feb. 6, 1978 | 44,159.92 |
| Total | $173,921.34 |

Payments from Frontrunner to Driving Hawk and Lone Dog

| Driving Hawk | | Lone Dog | |
| --- | --- | --- | --- |
| Date | Amount | Date | Amount |
| Aug. 8, 1977 | $2,500.00 | July 19, 1977 | $2,000.00 |
| Aug. 23, 1977 | 1,500.00 | Aug. 8, 1977 | 2,500.00 |
| Oct. 3, 1977 | 2,000.00 | Aug. 23, 1977 | 900.00 |
| Oct. 3, 1977 | 2,217.00 | Oct. 3, 1977 | 2,000.00 |
| Oct. 25, 1977 | 2,000.00 | Oct. 3, 1977 | 1,717.00 |
| Nov. 14, 1977 | 2,000.00 | Oct. 12, 1977 | 2,150.00 |
| | | Nov. 15, 1977 | 1,764.00 |
| Total | $12,217.00 | Total | $14,031.00 |

After these checks were returned by the bank to Attorney Strain, he entered the subject of each "purchase" on the memo portion of each check. Strain claimed that the payments to Driving Hawk and Lone Dog were for legitimate purchases.

The payments from A & P to Attorney Strain reflect the fact that he had been hired by A & P, shortly after the Tribe and A & P had made their agreement, as a "consultant" on the irrigation project. Thus, Strain was working for the Tribe and A & P simultaneously. Initially, A & P was to pay Attorney Strain $2,000 per month plus 4.5% of the contract amount. When the contract was expanded, Strain was to be paid $2,000 per month plus 6% of the contract amount. The president of A & P, Thomas Pearce, admitted at trial that, in an earlier and unrelated legal proceeding, he had testified that he was aware Strain was the attorney for TLE at the time A & P put Strain on retainer.

On June 29, 1978, Colombe appeared before the Tribal Council and made allegations to the effect that fraud, corruption and nepotism surrounded the irrigation project. As a result, the Council passed resolutions that provided for the formation of an investigatory committee, and also provided that "sign-offs" on the irrigation systems and finalization of the contract would be suspended until the committee completed its investigation. Driving Hawk presided at this meeting. The Tribe alleges that Strain obtained a copy of the minutes from the meeting and sent a copy to A & P.

Before the June 29 Council meeting, Driving Hawk had delegated to Eddie Farmer the task of checking and "signing off" each of the irrigation systems. Farmer began the sign-offs on June 6 and, despite the resolutions adopted by the Council, continued to make sign-offs until July 5,

1978. A separate sign-off for each system was signed by Farmer. After all the sign-offs were complete, Driving Hawk tried to pay A & P the balance of the contract price, but the check bounced because of insufficient funds.

#### b. The contract.

The parties had entered into a "turn-key" contract. That is, while the Tribe retained the right to determine the location of each irrigation system, A & P was responsible for the design, engineering, surveying, labor, supervision, equipment, tools, and materials incidental to the construction of each system. The contract document incorporated, by reference, a statement of contract conditions, a schedule for payments, and a "proposal".

There were several conditions to the contract, a few of which are relevant here. A & P was to guard the Tribe's property from injury or loss. Pursuant to this provision, A & P agreed to acquire insurance for this purpose and explicitly assumed responsibility for security. All work, material and records related to the project were to be subject to inspection by authorized Tribal representatives.

Further, the Tribe was to be the final judge of the quality and suitability of each phase of the project. Anything which did not meet the Tribe's approval was to be rebuilt, replaced, or fixed by A & P at A & P's expense. If this option was undesirable, the Tribe retained the right to reduce A & P's compensation in an amount the Tribe felt was equitable.

As each irrigation system was finished, it was to be inspected by the Tribe. If the work was acceptable, the Tribe was to pay A & P for the system less 10% as retainage. Upon this payment, a system became the Tribe's property, but payment was not to relieve A & P from responsibility for the obligations it had assumed under the contract. Nor was payment to be construed as a waiver of the Tribe's right to require fulfillment of the contract terms. If, after half of the work was done, the Tribe determined that A & P's performance was satisfactory, the Tribe was to pay in full for the work subsequently completed. However, the Tribe would continue to hold onto the fees retained during the first half of the project until thirty days after a certificate of completion had been issued.

Finally, the statement of conditions included a general guarantee.

Neither the final certificate of payment nor any provision in the contract documents nor partial or entire occupancy of the premises by [the Tribe] shall constitute an acceptance of work not done in accordance with the contract documents or relieve [A & P] of liability in respect to any express warranties for faulty materials or [work]. [A & P] shall remedy any defects in the work and pay for any damage to other work resulting therefrom, which shall appear within a period of one year from the date of final acceptance of work unless a longer period is specified. [The Tribe] will give notice of observed defects with reasonable promptness.

The "proposal" contained a list of parts and their cost. It also contained a limited, one year warranty which included a general disclaimer of all other warranties.[4] The

---

**4.**

Warranty
Limited One Year Warranty

A & P Steel, Inc., and Seller warrant each of its irrigation systems and parts and accessories thereof to be free from defects in materials and workmanship under normal use and service for a period of one year from date of delivery of any such system, part or accessory to the purchaser thereof. A & P Steel, Inc. and Seller will replace or repair, at their option, F.O.B. Colorado Springs, Colorado, any part of accessory which is discovered to be defective within the one year period. Notice of any claim hereunder must be delivered in writing to A & P Steel, Inc., at its offices in Colorado Springs and to Seller at its offices within 30 days of the discovery of the defect giving rise to such claim. This Warranty shall NOT apply:

(a) To any part or system which has been repaired or altered in any manner not authorized by A & P Steel, Inc.; to any system or part which has been subject to misuse, accident, vandalism, or act of God; or to any system or part which has not been installed according to manufacturer's specifications;

contract was signed on June 21, 1977. The proposal was mailed to the Tribe on June 30, 1977.

### c. Lone Dog's deposition and grand jury testimony.

Before trial, the Tribe took the deposition of Richard Lone Dog who held the chair of TLE. At the time the deposition was taken, Lone Dog was represented by Attorney Strain. Lone Dog's deposition testimony flatly contradicted the allegations contained in the Tribe's complaint.

The Tribe subpoenaed Lone Dog as a witness for trial. Lone Dog had been advised by his attorney to invoke the Fifth Amendment's protection against self-incrimination and refuse to testify. A & P objected to the Tribe calling Lone Dog to the stand solely for the purpose of having the jury hear him claim the Fifth Amendment. Following an *in camera* hearing, the trial court sustained A & P's objection. The trial court offered to let the Tribe read Lone Dog's deposition into evidence, but the Tribe declined.

During the presentation of its case, A & P tried to read into evidence Lone Dog's deposition. The Tribe objected. Following another *in camera* hearing, the trial court overruled the Tribe's objection because Lone Dog still claimed the Fifth Amendment and thus was held to be an "unavailable witness". *Fed.R.Civ.P.* 32(a)(3) [5]; *Fed. R.Evid.* 804(a)(1).[6]

On September 18, 1981, Lone Dog appeared as a witness before a federal grand jury. He testified that, prior to the time the contract between the Tribe and A & P was signed, Strain approached Lone Dog, told him he intended "to make some money off the contract", and would be inclined to give some of this money to Lone Dog.[7] Lone Dog was shown each of the checks which Strain had made out to Lone Dog, and testified as to what each *allegedly* had bought. Lone Dog then testified that the ·six checks which reflected purchases of hay actually were "payoffs". He also testified that a seventh check which reflected

(b) If the water used in the system contains materials or chemicals which adversely affect the operation of the system or any of its parts;
(c) If the system is operated on grades in excess of 15 percent;
(d) If the system or any part thereof is damaged as a result of surge pressures in excess of 150 P.S.I. or the application of insufficient, excess or improper electrical voltage and current;
(e) If the system is operated in lagoons, swamps or other water saturated soils;
(f) If the system is operated without a connected and operating shut-off system;
(g) If the system is operated in air temperatures of 38° or less;
A & P Steel, Inc. assumes no responsibility for placement of the pivot point location in fht [sic] field.
WARRANTY DISCLAIMERS: NO WARRANTIES, EXPRESS OR IMPLIED, OTHER THAN THE EXPRESS WARRANTY SET FORTH ABOVE, INCLUDING WARRANTIES OR MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE MADE BY MANUFACTURER OR SELLER. NEITHER MANUFACTURER NOR SELLER ASSUMES ANY RESPONSIBILITY FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF A BREACH OF THIS CONTRACT OR OF THE TERMS OF THE EXPRESS WARRANTY OR OUT OF THE OPERATION OR INABILITY TO OPERATE THE EQUIPMENT COVERED HEREUNDER.

5. *Fed.R.Civ.P.* 32(a)(3) provides:

At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions ....

....

... (3) the deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds ... (E) upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used.

6. *Fed.R.Evid.* 804(a)(1) provides:

"Unavailability as a witness" includes situations in which the declarant—

(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement;

7. Evidence adduced at trial revealed that Lone Dog did receive $14,031.00 from Strain over a period of six months.

a purchase of a pick-up truck was partially a payoff.

Lone Dog testified that he had neither sold nor delivered *any* hay to Strain. Finally, he testified that Attorney Strain had advised him to give false testimony during the deposition.

## II. Discussion.

### a. The Rule 60(b) Motion.

After the Tribe became aware of Lone Dog's grand jury testimony, it moved for relief from judgment on the grounds of newly discovered evidence under *Fed.R. Civ.P.* 60(b)(2), fraud of an adverse party under *Fed.R.Civ.P.* 60(b)(3), and fraud upon the court under *Fed.R.Civ.P.* 60(b)(6). The trial court held that Rule 60(b)(2) was inapplicable to the facts of this case because: (1) Lone Dog's inconsistent stories were not evidence which existed at the time of trial; (2) the evidence was merely cumulative or impeaching; and (3) the evidence was not such as probably would have affected the outcome of trial. We disagree. We also think a fraud has been practiced on the Tribe and on the court, which impinged the integrity of the trial process, and that the Tribe should have been granted a new trial under Rule 60(b)(2) and (3).

■ We recognize that a Rule 60(b) motion is viewed with disfavor and is addressed to a district court's discretion which an appellate court will not disturb in the absence of abuse. *Dabney v. Montgomery Ward & Co., Inc.,* 692 F.2d 49, 52 (8th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 2429, 77 L.Ed.2d 1316 (1983); *Edgar v. Finley,* 312 F.2d 533, 536–37 (8th Cir.1963). Nevertheless, Rule 60(b) motions serve a useful, proper and necessary purpose in maintaining the integrity of the trial process, and a trial court will be reversed where an abuse of discretion occurs. The Rule "provides for extraordinary relief which may be granted only upon an adequate showing of exceptional circumstances," *Clarke v. Burkle,* 570 F.2d 824, 830–31 (8th Cir.1978), *quoting, Hoffman v. Celebrezze,* 405 F.2d 833, 835 (8th Cir.1969);

*Consolidated Gas & Equip. Co. v. Carver,* 257 F.2d 111, 114 (10th Cir.1958); *see Assmann v. Fleming,* 159 F.2d 332, 336 (8th Cir.1947).

■ Rule 60(b) was intended to preserve "the delicate balance between the sanctity of final judgments ... and the incessant command of a court's conscience that justice be done in light of all the facts." *Good Luck Nursing Home, Inc. v. Harris,* 636 F.2d 572, 577 (D.C.Cir.1980), *quoting, Bankers Mortgage Co. v. United States,* 423 F.2d 73, 77 (5th Cir.), *cert. denied,* 399 U.S. 927, 90 S.Ct. 2242, 26 L.Ed.2d 793 (1970); *see United States v. Walus,* 616 F.2d 283, 288 (7th Cir.1980). Thus, the Rule is intended "to prevent the judgment from becoming a vehicle of injustice". *Walus,* 616 F.2d at 288. According to *Johnson Waste Materials v. Marshall,* 611 F.2d 593, 600 (5th Cir.1980), *quoting, Laguna Royalty Co. v. Marsh,* 350 F.2d 817, 823 (5th Cir.1965), the Rule is to be given a liberal construction" and "is to be construed liberally to do substantial justice." *See Edgar,* 312 F.2d at 538.

■ In order to obtain relief under Rule 60(b)(2), on grounds of newly discovered evidence, the moving party must establish that: (1) the evidence was discovered after trial; (2) it exercised due diligence to obtain the evidence for trial; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence is such that a new trial probably would produce a new verdict. *United States v. Gustafson,* 728 F.2d 1078 at 1084 (8th Cir.1984); *Walus,* 616 F.2d at 287–88; *Johnson Waste,* 611 F.2d at 597; *Edgar,* 312 F.2d at 537. We consider these requirements seriatim.

■ Judgment in this case was entered on August 27, 1982. The Tribe first became aware of Lone Dog's grand jury testimony during the criminal trial the government brought against Strain, which began on November 1, 1982. It is clear that the evidence was discovered after trial.

In denying the motion for a new trial, the trial court found that the Tribe had failed

to prove that it had exercised due diligence to produce evidence of Lone Dog's inconsistent stories in time for trial. We disagree.

At the time of trial the Tribe had done everything it could have done to discredit Lone Dog's deposition testimony and to establish that A & P and Lone Dog were involved in a conspiracy. The Tribe took Lone Dog's deposition; the Tribe proved that Lone Dog had received a series of payments from Strain and that these payments coincided with payments Strain had received from A & P; the Tribe adduced evidence that the checks Strain had made out to Lone Dog had been altered to reflect the alleged subject of each purchase after the checks had been processed by the bank; and the Tribe tried to subpoena Lone Dog as a witness. Further, the Tribe filed a 60(b) motion promptly after discovering that Lone Dog had told inconsistent stories. We believe that these actions reflect due diligence on the Tribe's part.

The trial court also held that the Tribe had failed to meet the standards of Rule 60(b) because the evidence of Lone Dog's inconsistent stories did not exist at the time of trial. We have been unable to locate authority for this proposition. However, it is not necessary to reach the question. If, as Lone Dog has testified, his deposition contained perjured testimony, then the perjury existed at the time of trial. In fact it was read into evidence at trial. It does not matter that an admission of perjury came to light only after trial.

The trial court also held, in essence, that the grand jury testimony merely was cumulative or impeachment evidence. We disagree.

The evidence which the Tribe adduced to show Lone Dog's involvement in the alleged conspiracy has been set forth already. All of that evidence was circumstantial. Absent concrete evidence of wrong-doing, the jury may not have had sufficient reason to doubt Lone Dog's deposition testimony. Lone Dog's grand jury testimony, however, is the only concrete evidence there is that A & P may have been making payoffs to members of the Tribe through Strain. While in a technical sense Lone Dog's grand jury testimony is cumulative, in another sense the evidence sheds an entirely different light on the circumstantial evidence and lends greater weight to the Tribe's allegations. At the same time, the admissions in the grand jury testimony discredit one of A & P's principal witnesses. The entire complexion of the case has been changed. Under these circumstances, Lone Dog's grand jury testimony cannot be construed as "merely cumulative". Nor, for the same reasons, can this evidence be categorized solely as "impeachment" evidence.

The district court did not address directly the issue of materiality. However, the conclusion that the grand jury testimony was not material can be gleaned from the language of the opinion. The court seemed to reach this conclusion by comparing the deposition testimony with the testimony Lone Dog gave at Strain's criminal trial. This analysis misses the mark for significant reasons.

From a reading of the record and briefs, it appears that, with one exception, Lone Dog's deposition testimony regarding the money he received from Strain and the testimony he gave at Strain's trial were consistent, even though both the deposition and trial testimonies were inconsistent with Lone Dog's grand jury testimony. However, this consistency does not detract from the materiality of the grand jury testimony.

It must be remembered that Lone Dog assumed, not only a fiduciary position in relation to the Tribe but also, a position central to facilitation of the irrigation project. The grand jury testimony flatly contradicts the testimony Lone Dog gave in two other proceedings; he testified that he had accepted payoffs from Strain and that Strain asked him to lie when the deposition was taken. If we assume that Lone Dog testified truthfully before the grand jury, then the materiality of the evidence is apparent. As the Tribe points out, the perjured deposition testimony is not "some inconsequential fact". Rather, it is a fact

"which binds all of the other facts together" and tends to prove the Tribe's allegations. Conspiracy was a central issue in the case, and whether Lone Dog was receiving payoffs from A & P through Strain is material to the issue of conspiracy.

However, even if we make no assumptions about the truth of the testimony Lone Dog gave on three separate occasions, the inconsistent stories still are material evidence in this case. Lone Dog was a principal witness in A & P's case. At the very least, his inconsistent stories demonstrate that he is a liar and, as such, a witness whose testimony is to be discredited. The deposition testimony is significant enough to have swayed the jury to return a verdict for A & P. At a minimum, the Tribe is entitled to an opportunity to present *all* the relevant facts to a jury. For all these reasons, we conclude that the evidence of Lone Dog's grand jury testimony is such that a new trial probably would produce a new verdict.

### b. The Agency Instruction.

One of the bases supporting the trial court's denial of the 60(b) motion was the possibility that the jury may have determined that, if fraud and bribery occurred, Strain, Lone Dog, Driving Hawk, and McPherson were acting for their own independent purposes and not as agents of A & P. If indeed the jury made this determination, it did so pursuant to an instruction given by the trial court. Instruction No. 10 provided:

> An act of an officer, agent or employee of a corporation done to effect some independent purpose ... is not within the scope of ... employment and accordingly the corporation will not be charged with notice of facts of which an officer, agent or employee acquires knowledge ... while acting in a transaction in which he is interested, either for himself or for another, adversely to the corporation.

This instruction is erroneous, as a matter of law.

*Fed.R.Civ.P.* 61 provides in pertinent part, as follows:

> No error in either the admission or exclusion of evidence and no error or defect in any ruling or order in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict ... unless refusal to take such action appears to the court inconsistent with substantial justice. The court ... must disregard any error or defect ... which does not affect the substantial rights of the parties.

The rule is adhered to save in exceptional cases "where the obvious result would be a plain miscarriage of justice" ... *United States v. South Dakota*, 665 F.2d 837, 842 (8th Cir.1981), *cert. denied*, 459 U.S. 823, 103 S.Ct. 52, 74 L.Ed.2d 58 (1982), *quoting*, *Hormel v. Helvering*, 312 U.S. 552, 558, 61 S.Ct. 719, 722, 85 L.Ed. 1037 (1941) or would be "inconsistent with substantial justice." *United States v. South Dakota*, 665 F.2d at 842. The rule applies to jury instructions as well as other errors. *E.F. Hutton Co., Inc. v. Berns*, 682 F.2d 173, 177 (8th Cir.1982). In determining whether an erroneous jury instruction affects the substantial rights of one party, we look to the record as a whole including the allegations of the complaint, the evidence, and the remaining instructions. *Hallberg v. Brasher*, 679 F.2d 751, 758 (8th Cir.1982).

A principal is liable for the deceitful or fraudulent acts of its agents, which are committed in the course of the business the agent was appointed to carry out. *United States v. Johnson*, 541 F.2d 710, 712 (8th Cir.1976), *cert. denied*, 429 U.S. 1093, 97 S.Ct. 1106, 51 L.Ed.2d 539 (1977); *Myzel v. Fields*, 386 F.2d 718, 738, 749–50 (8th Cir.1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); *Weaver v. Metropolitan Life Ins. Co.*, 545 F.Supp. 74, 77 (E.D.Mo.1982); *Southern Pac. Transp. Co. v. Continental Shippers Ass'n*, 485 F.Supp. 1313, 1319 (W.D.Mo. 1980), *aff'd*, 642 F.2d 236 (1981). *See Karlen v. Ray E. Friedman & Co. Commodities*, 688 F.2d 1193, 1198 n. 5 (8th Cir.1982). This is true even if the agent's conduct is carried on without the principal's knowledge. *Myzel*, 386 F.2d at 738; *Weaver*, 545 F.Supp. at 77; *see Karlen*, 688 F.2d at 1198

n. 5. Between a principal and a third party, the principal must bear the burden of an agent who has acted improperly. *Johnson,* 541 F.2d at 713, *quoting, Standard Distrib. v. F.T.C.,* 211 F.2d 7, 15 (2d Cir. 1954).

█ It is undisputed that A & P, not McPherson in his personal capacity, hired Attorney Strain as a "consultant" on the irrigation project. Further, Pearce, as president of A & P, was aware that Strain had been hired. Finally, the money Strain received from his involvement with the project came from A & P out of corporate funds—not out of McPherson's pocket. It is clear, as a matter of law, that Strain and McPherson were acting as agents of A & P and not for their own independent purposes.

The effect of the trial court's instruction was to relieve A & P of responsibility for the acts of its agents. Thus, even if the jury had determined that there had been a conspiracy to defraud the Tribe, it was left with the option to return a verdict for A & P. To allow this error to go unnoticed and uncorrected would result in a plain miscarriage of justice. The instruction should not be given at a re-trial.

c. The Aggravated Injury Instruction.

In its charge to the jury the trial court gave Instruction No. 24 which provided as follows:

One who seeks recovery for breach of warranty may not recover for damages proximately caused by his use of a product which occurred after he obtained knowledge of the defect or condition, which he claims constituted a breach of warranty, unless you find that under the particular circumstances a person of ordinary prudence would have used the prod-

uct despite knowledge of such defect or condition.

Nor may a party recover for injuries proximately caused by ... use of the product which occurred after such defect could. have been discovered ... in the exercise of ordinary care, unless you find that under the circumstances a person of ordinary prudence would have used the product.

However, a party may recover for injuries proximately caused by a breach of warranty before the defect or condition constituting the breach was discovered or could have been discovered ... in the exercise of ordinary care.

The Tribe contends that the trial court erred by giving this instruction. We agree.

█ This instruction mirrors *South Dakota Pattern Jury Instruction* No. 150.27. As such, the instruction is a correct statement of the law in South Dakota. Nevertheless, for several reasons the instruction was inapplicable to the facts of this case.

First, the parties specifically addressed this issue in the contract. Provision Number 26 in the contract provided that the Tribe was free to use the irrigation systems despite defects. It also provided that A & P would be responsible for any damage that resulted from defects in the systems.[8] Common sense supports the rationale behind this provision. There was no way to know if any of the systems were defective unless and until they were used. Further, continuous use may have been necessary in order to detect defects.

Second, even if this instruction is proper, it was not proper at a trial where only liability was in issue. This instruction goes to the issue of damages. Third, the issue to which this instruction was addressed

---

**8.** Provision Number 26 was a general guarantee. Specifically, it provided:

Neither the final certificate of payment nor any provision in the contract documents nor partial or entire occupancy of the premises by [the Tribe] shall constitute acceptance of work not done in accordance with the contract documents or relieve [A & P] of liability in respect to any express warranties or re-

sponsibility for faulty materials or [work]. [A & P] shall remedy any defects in the work and pay for any damage to other work resulting therefrom, which shall appear within a period of one year from the date of final acceptance of work unless a longer period is specified. [The Tribe] will give notice of observed defects with reasonable promptness.

was covered adequately, and more concisely, by other jury instructions.[9]

Finally, we think this instruction was repetitious and that it placed undue emphasis on a matter favorable to A & P's case. In the past, we have noted that these characteristics may be sufficient to warrant reversal. *Dobson v. Bacon Transp. Co.*, 607 F.2d 805, 807–08 (8th Cir.1979); *Flentie v. American Community Stores Corp.*, 389 F.2d 80, 83 (8th Cir.1968). Our disposition of this case makes a ruling on the prejudicial effect of the instruction unnecessary. However, the instruction should not be given at a re-trial.

d. The Issue of "Release".

On June 29, 1978, the Tribal Council passed a resolution which provided that "sign-offs" on the irrigation systems were to be suspended until an investigation into allegations of fraud had been made. Driving Hawk, as president of the Tribe, presided over this meeting. Nevertheless, Driving Hawk did not suspend execution of the sign-offs which were being completed by Eddie Farmer. Farmer began making sign-offs on June 6, 1978, and had finished them by July 5, 1978.

A & P argues that these sign-offs acted to release A & P from all liability under the contract. The trial court submitted the task of determining the validity of these sign-offs as "releases" to the jury. The Tribe contends that it was error to submit the issue to the jury. We agree.

A release is a writing which provides that a duty owed to the maker of the release is discharged immediately or on the occurrence of the condition. *Restatement (Second) of Contracts* § 284 (1979). Given this definition and a review of the contract, it is clear that neither party originally intended the sign-offs to act as a release from liability.

Provision Number 17 of the contract provides, in pertinent part, as follows:

As each irrigation "project" or system is completed by [A & P] and inspected by [the Tribe] and found to be satisfactorily completed and in working order, [the Tribe] shall make payment to [A & P] for the complete system less ten percent (10%) retainage.

All material and work covered by partial payments made shall thereupon become the sole property of [the Tribe], but this provision shall not be construed as relieving [A & P] from the sole responsibility for the care and protection of materials and work upon which payments have been made or the restoration of any damaged work, or as a waiver of the right of [the Tribe] to require fulfillment of all the terms of the contract . . . .

. . . .

If, after 50 percent . . . of the work has been completed, [the Tribe] determines that [A & P's] performance and progress are satisfactory, [the Tribe] may make the remaining payments in full for the work subsequently completed but shall hold back the amounts already retained. *The amounts retained shall not be released by [the Tribe] until 30 days after the issuance of FINAL CERTIFICATE OF COMPLETION, which establishes that the project is totally complete.*

(emphasis added). "The interpretation and construction of written contracts are matters of law within the competence of Courts of Appeal to review." *Standard Title Ins. Co. v. Union Pac. Ins. Co.*, 364 F.2d 287, 289 (8th Cir.1966).

Basic to contract interpretation are the principles that the writing is read as a whole and interpreted in a way that will give effect to its general purpose, and an interpretation which makes the contract valid and reasonable will be preferred to that which would make it void or meaningless . . . . And in releases as in other contracts, the intent of the parties as expressed in the document and in light of

---

**9.** In as much as these other instructions also go to the issue of damages and not the issue of liability, there is some question as to the propriety of the instructions on remand. When a trial

is bifurcated along the lines of these issues, jury instructions should be tailored narrowly according to the appropriate phase of the trial.

the circumstances, should be given effect. (citations omitted)

*American Commercial Lines, Inc. v. Valley Line Co.*, 529 F.2d 921, 925 (8th Cir. 1976).

The language of the contract indicates that the parties contemplated partial acceptance as the project progressed, but that total acceptance would be contingent upon fulfillment of the contract terms and the issuance of a certificate of completion. The Tribe never issued a certificate of completion. In other words, the Tribe could have issued a partial acceptance of each individual system, and still have held A & P to the terms of the contract.

It is clear from the record that the sign-offs did not have significance independent of the contract. Farmer made the sign-offs between June 6 and July 5, 1978. The Tribal Council voted to suspend all sign-offs at its meeting on June 29, 1978. The only reason sign-offs would have been made before the June 29 meeting is because they represented the partial acceptances reflected in Provision Number 17 in the contract. Further, it would not have made any sense for the Tribal Council to suspend the remaining sign-offs unless they drew their significance from the language of the contract.

In short, the sign-offs were made pursuant to the contract not in spite of the contract. The sign-offs did not constitute a release of liability; they represented partial acceptance of A & P's performance. Under this interpretation, it was error to submit the issue of release to the jury.

### e. Lone Dog's Unavailability as a Witness.

The Tribe subpoenaed Lone Dog as a witness for trial. A & P objected on the ground that Lone Dog intended to invoke the Fifth Amendment. The trial court sustained this objection. Later, A & P tried to read Lone Dog's deposition into evidence. The Tribe objected claiming that Lone Dog should have been called to the stand. However, because Lone Dog revealed that he still intended to invoke the Fifth Amendment, the trial court ruled that he was an "unavailable" witness. *See Fed.R.Evid.* 804(a)(1); *Fed.R.Civ.P.* 32(a)(3). The Tribe contends that it should have been allowed to call Lone Dog to the stand despite his intention to invoke the Fifth Amendment. Given the circumstances presented by this case, we agree.

In *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), Justice Goldberg eloquently summarized the rationales behind the purposes served by the Fifth Amendment.

The privilege against self-incrimination .... reflects many of our fundamental values and most noble aspirations: our unwillingness to submit those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates "a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown ... and by requiring the government in its contest with the individual to shoulder the entire load"; ... our respect for the inviolability of the human personality; ... our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes a "shelter to the guilty," is often a "protection to the innocent."

*Id.* at 55, 84 S.Ct. at 1596 (citations omitted). *See* Heidt, *The Conjurer's Circle—The Fifth Amendment Privilege in Civil Cases*, 91 Yale L.J. 1062, 1083–87 (1982).

In a criminal case, the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965). To allow otherwise would make an individual's assertion of the privilege costly. *Id.* at 614, 85 S.Ct. at 1233. Courts are under a mandate to accord "liberal construction" to the Fifth Amendment in "favor of the right it was

intended to secure"—the right against self-incrimination. *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951).

Nevertheless, the Supreme Court has recognized that the law of privileges tends to suppress the truth. As a result, privileges "must be strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify ... has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'" *Trammel v. United States,* 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980), *quoting, Elkins v. United States,* 364 U.S. 206, 234, 80 S.Ct. 1437, 1454, 4 L.Ed.2d 1669 (1960) (Frankfurter, J., dissenting). More significantly, the Supreme Court also has recognized that, in determining whether inferences may be drawn from the invocation of the Fifth Amendment, there is a distinction between civil and criminal cases. *See Baxter v. Palmigiano,* 425 U.S. 308, 316–18, 96 S.Ct. 1551, 1557–58, 47 L.Ed.2d 810 (1976); *see also id.* at 335, 96 S.Ct. at 1566, (Brennan, J., dissenting). Indeed, one commentator has noted that "[i]n civil litigation between private parties, current Fifth Amendment jurisprudence sacrifices the determination of truth, the policies underlying liberal discovery, and the vindication of public and private rights to an extent rarely appreciated." Heidt, *The Conjurer's Circle,* 91 Yale L.J. at 1064.[10]

In part, policies underlying the Fifth Amendment are directed at diminishing the force which can be brought to bear upon an individual by the government. *See Murphy,* 378 U.S. at 55, 84 S.Ct. at 1596; *Baxter,* 425 U.S. at 335, 96 S.Ct. at 1566 (Brennan, J., dissenting). In other words, the Fifth Amendment is necessary to protect criminal suspects from governmental coercion in the government's attempt to obtain criminal confessions. However, in "a private civil action ... the government lacks

any opportunity for coercion, and this policy simply does not operate." Heidt, *The Conjurer's Circle,* Yale L.J. at 1084; *see Garner v. United States,* 424 U.S. 648, 655–56, 96 S.Ct. 1178, 1182–83, 47 L.Ed.2d 370 (1976). ([The adversary system] is undermined when a government deliberately seeks to avoid the burdens of independent investigation by compelling self-incriminating disclosures. In areas where government cannot be said to be compelling such information, however, there is no such circumvention of the constitutionally mandated policy of adversary criminal proceedings.") *See also Baxter,* 425 U.S. at 335, 96 S.Ct. at 1566 (Brennan, J., dissenting).

The Amendment also reflects the policy of "fair play which dictates 'a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown and ... by requiring the government ... to shoulder the entire load'" in establishing an individual's guilt. *Murphy,* 378 U.S. at 55, 84 S.Ct. at 1597. However, only if the privilege is eliminated in civil cases will this balance be shifted. Allowing the jury to draw an inference from a witness' invocation of the Fifth Amendment does not affect the balance. Indeed, the Supreme Court has held that the Fifth Amendment does not preclude an adverse inference when the privilege is claimed by a party to a civil case. *Baxter,* 425 U.S. at 318, 96 S.Ct. at 1558; *id.* at 334, 96 S.Ct. at 1566 (Brennan, J., dissenting). The policies supporting the Fifth Amendment apply with even less force when a non-party witness testifies in a civil proceeding and thus, the Amendment should not work to preclude an adverse inference in this situation.

Finally, there is embodied in the Amendment the concern with submitting any individual to the "cruel trilemma of self-accusation, perjury or contempt ...." *Murphy,* 378 U.S. at 55, 84 S.Ct. at 1596. However, because the cruelty of being forced to

---

**10.** Professor Heidt's article deals with the problem of corporate defendants who invoke the Fifth Amendment during discovery in anti-trust suits. However, the Professor's analysis may be generalized and applied here where a non-party witness invokes the Fifth Amendment when subpoenaed for trial.

increase one's criminal exposure is what the privilege is concerned with, retaining the availability of the privilege in civil cases and simply allowing the jury to draw an adverse inference from its invocation neither jeopardizes the privilege nor the witness. *See generally*, Heidt, *The Conjurer's Circle*, 91 Yale L.J. at 1062–1135.

We conclude that, under certain circumstances, a party may call a witness to the stand even when that witness has made known an intention to invoke the Fifth Amendment. We find support for this conclusion in the codification of the privilege in *Fed.R.Evid.* 501.[11] As the Supreme Court has noted:

> In rejecting the proposed Rules and enacting Rule 501, Congress manifested an affirmative intention not to freeze the law of privilege. Its purpose rather was to "provide the courts with the flexibility to develop rules of privilege on a case-by-case basis" ... and to leave the door open to change.

*Trammel*, 445 U.S. at 47, 100 S.Ct. at 911. In addition, some states have adopted the approach we adopt today, 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 513[03] at 513–9, 513–10, and finally, the Second Circuit has recently adopted this approach in a case similar to the case before us. *Brinks, Inc. v. City of New York*, 717 F.2d 700 (2d Cir.1983).[12]

Having reached this conclusion we now apply it to the circumstances of the case before us. Lone Dog was a principal actor in a situation fraught with fraud. He was involved in an alleged, triangular conspiracy between A & P, Strain, and officers of the Tribe. There is a more significant consideration, however. Even though it was the Tribe which initially called Lone Dog as a witness, Lone Dog was really A & P's witness. By introducing into evidence Lone Dog's favorable deposition testimony, A & P made Lone Dog its principal witness and, simultaneously, effectively precluded the opportunity for cross-examination. Further, even though the grand jury testimony has increased the likelihood that the deposition testimony was perjured, from the court's point of view the evidence presented at trial by the Tribe was sufficient to cast considerable doubt on the truth of Lone Dog's deposition. Yet this evidence, by itself, could not have overcome the weight or significance the deposition testimony would have had with the jury. Once the deposition was allowed into evidence, it was necessary to allow the Tribe to call Lone Dog as a witness in order to offset the unfair advantage A & P gained by being allowed to use the deposition.

The Federal Rules of Evidence and the Federal Rules of Civil Procedure were enacted in order to secure fairness in the administration of justice; to guarantee that the truth would be ascertained and proceedings would be determined justly. *Fed. R.Evid.* 102. *See Fed.R.Civ.P.* 1. These rules were not designed to be manipulated

---

**11.** For a detailed analysis of Rule 501's history, the Advisory Committee Notes, and the variations on the Rule adopted in several states *see* 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 513[01]–513[03].

**12.** *Brinks* also involved the propriety of non-party witnesses invoking the Fifth Amendment. Brinks had a contract with the City to collect money from parking meters. Some of Brinks' employees were stealing money from the meters. After the employees were arrested the City suspended and then cancelled the contract. Brinks sued the City for breach of contract; the City counterclaimed on grounds of breach and negligence. *Brinks*, 717 F.2d at 702–04.

At trial, the City called the guilty ex-employees as witnesses, even though it was aware that these witnesses intended to invoke the Fifth Amendment. In response to Brink's objection, the trial court ruled that the witnesses would be called and questioned; their refusal to answer on Fifth Amendment grounds was competent and admissible evidence. The trial court also allowed counsel for the City to argue that the ex-employees' reliance on the Fifth Amendment was circumstantial evidence in support of the City's claim. Finally, the trial court specifically instructed the jury on the issue stating that an adverse inference against Brinks was permissible. *Id.* at 707. The Court of Appeals agreed with the trial court's rulings and affirmed the verdict. *Id.* at 710; *but see id.* at 715 (Winter, J., dissenting).

unfairly, by any party in a legal proceeding, so as to obscure the truth. Yet to allow A & P to have Lone Dog rendered unavailable as a witness and then read his deposition into evidence, achieved just that: an unfair manipulation of the rules of evidence and procedure, which succeeded in obscuring the truth. This misuse of rules designed to assist in the struggle for justice cannot, and will not, be tolerated. While truth may be a goal which only can be obtained imperfectly, it is nonetheless one to which courts of law constantly must aspire.

We recognize that our decisions in *Holt v. Wyrick*, 649 F.2d 543, 548 (8th Cir.1981), *cert. denied*, 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982) and *Witham v. Mabry*, 596 F.2d 293, 297 (8th Cir.1979), held that an invocation of the Fifth Amendment renders a witness "unavailable" under *Fed. R.Evid.* 804(a)(1). Our decision today is consistent with *Holt* and *Witham*. Those cases were criminal prosecutions, and this case involves a civil matter between two private parties. Further, we are not declaring a bright-line rule for use in all civil cases. We simply are holding that given the circumstances presented in this case the Tribe should have been allowed to call Lone Dog as a witness.

### III. Conclusion.

We reverse the district court's denial of the Rule 60(b) motion for a new trial. Lone Dog's admission of perjury before the grand jury was new evidence which could not have been discovered for trial or in time to move for a new trial pursuant to *Fed.R.Civ.P.* 59(b), which was material, and which probably would have produced a different verdict had it been heard by a jury. In reversing, we hold that the trial court erred in giving instruction No. 10 on agency and instruction No. 24 on aggravated injury. These instructions should not be given upon retrial. We also hold that it was error to submit the issue of release to the jury. Finally, we hold that the Tribe should have been allowed to call Lone Dog to the stand for purposes of cross-examination. Accordingly, this case is reversed and remanded for a new trial consistent with this opinion.

Costs assessed against Appellee.