**STATE OF GEORGIA, Plaintiff,**

v.

**SIX HUNDRED FORTY THOUSAND, SEVEN HUNDRED SIXTY-EIGHT DOLLARS IN U.S. CURRENCY, Defendant,**

**Rolland Callahan, Intervenor,**

**United States of America, Intervenor.**

**No. 1:85-cv-1700A-HTW.**

United States District Court, N.D. Georgia, Atlanta Division.

Nov. 7, 1988.

See also 179 Ga.App. 556, 347 S.E.2d 269.

Dennis C. O'Brien, Marietta, Ga., Barbara B. Conroy, Dist. Atty., DeKalb County, Decatur, Ga., for plaintiff.

J.D. Roy Atchison, Asst. U.S. Atty., Atlanta, Ga., for defendant.

## MEMORANDUM OPINION

### HORACE T. WARD, District Judge.

This matter was before the court for a nonjury trial[1] on December 9, 10, and 14, 1987. Plaintiff claims that the defendant currency is subject to forfeiture pursuant to O.C.G.A. § 16–13–49 (Michie 1984 & Supp.1987). The intervenor, Callahan, denies that the currency is subject to forfeiture and claims that it belongs to him. The United States has asserted a tax lien upon the currency.[2] This action was originally filed in the Superior Court of Dekalb County. It was removed to this court by the United States, pursuant to 28 U.S.C.A. §§ 1442(a)(1), 1444 & 1446. After having reviewed the evidence presented at the trial and having heard the argument of counsel, the court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

The intervenor was arrested on or about December 9, 1984 in DeKalb County, Georgia, on a state charge of conspiracy to commit murder for hire. At the time of his arrest, intervenor and the automobile he was about to enter were searched. The search revealed 23 grams of cocaine.

In connection with DeKalb County's investigation of the murder for hire charges, search warrants were issued for two houses identified as possible residences of intervenor: one at 3979 Pinehurst Place, Decatur, Georgia; the other at 2166 Rollingview Drive, Decatur, Georgia. No items were seized from the Rollingview house and no drugs or drug paraphenalia were found there. However, several items, including the defendant currency, were seized during the search of the Pinehurst residence. No drugs were seized at this residence. The currency, which primarily consisted of bills in small denominations, was wrapped in rubber bands and stored in yellow plastic bags. It was found in three locations: behind a false panel in a walk-in closet, in an armoire in the basement, and in a baby crib. Several firearms, including a semiautomatic rifle, were found, as well as ammunition. The firearms were found near two of the three stashes of money. Also found were certain cards or papers which contained intervenor's name and a booklet entitled, "Cocaine Consumers Handbook."[3] An identification card was found which contained a picture of intervenor with the name "Richard Howard." The home was lavishly furnished.

The murder for hire charge against intervenor was dismissed at the initial committment hearing due to lack of evidence. However, intervenor was convicted of possession of cocaine and received a ten year sentence.

For the years 1980, 1981, 1982, and 1983, intervenor filed federal income tax returns which showed his income for each of those years to be less than $11,000. Intervenor's 1984 federal income tax return, which was filed after the defendant currency was seized, claimed over one million dollars in "Fifth Amendment Income."

In the early 1980's, intervenor invested in the construction of a shopping center on Perry Boulevard. In 1982 and 1983 he invested $100,000 in the start-up of a martial arts studio, Unity Martial Arts. Most of the purchases for the renovation of the building housing the studio and for the studio's equipment were made in cash. Intervenor also invested $100,000 in an ar-

---

1. Plaintiff had originally sought a jury trial but waived its jury demand at the time of trial.

2. The United States initially argued that its claim to the currency took priority over the one asserted by the plaintiff. At the time of trial, however, the United States stated that it did not wish to pursue a position which was adverse to the plaintiff's claim; it did, however, wish to exercise its lien upon the currency if intervenor Callahan's claim should prevail.

3. The plaintiff also offered some evidence that a small scale was found which is the type used to measure small amounts of drugs. However, no such scale was listed as a seized item on the search warrant return. In addition, the "scale" placed in evidence at trial appeared nonfunctional due to missing parts.

cade business, at least $300,000 in the development of a subdivision, and other funds in real estate and a night club. A police officer with the DeKalb County Department of Public Safety conducted an extensive review of businesses and finances he felt were connected to intervenor and concluded that no legitimate source could be found for most of the money invested. However, the investigation revealed that some of the investments generated income and that the intervenor had received some benefits from a fire insurance policy; but that the income generated by legitimate sources was insufficient to account for the large amount of money invested by intervenor. It was shown that most of the businesses were begun with a cash investment.

Weyman Bearden, a residential building contractor, testified that he built the residence on Pinehurst in 1978–1979. Bearden stated that intervenor engaged him to build the house, but that intervenor had identified himself to Bearden as Robert Johnson. Bearden made an in-court identification of intervenor as being the person he knew as Robert Johnson. He also said that intervenor paid over $190,000 for the house and a tennis court and pool were constructed by other contractors at additional expense. Bearden recalled that intervenor moved into the house in 1979. He testified that an attorney made payments to him on behalf of "Robert Johnson." Thus, this evidence shows that the intervenor used an assumed name in relation to at least one business transaction, that he had sufficient funds in 1978–1979 to purchase a home costing close to $200,000, and that he moved into that home.

Jerry Rhome was a partner in the Unity Martial Arts Institute, along with James Skinner and intervenor. Two police officers, Rick Dillon and Douglas Maples, testified that Rhome had told them and one other officer that intervenor provided him with a pound of cocaine during 1984, and that Rhome had sold part of the cocaine and had attempted to flush some of it down the commode when he feared the police would discover him. They also testified that Rhome had said he had told intervenor that he was unable to pay him for the cocaine because it had been stolen. Maples testified that Rhome told him intervenor provided him with cocaine; Rhome was to distribute the cocaine and then pay intervenor for it out of the proceeds. No recording or transcription was made of Rhome's statement, the officers said. Rhome testified that he never made these statements to Dillon. He also denied that he had ever received drugs from intervenor. In later testimony, however, he conceded that on one occasion police had found cocaine in his commode. The court finds the testimony of Dillon and Maples to be more credible than that of Rhome.

The testimony of James Skinner was presented by deposition. As noted above, Skinner was a partner in the Unity Martial Arts Institute. Skinner's partnership in Unity was ended in 1984. He testified that intervenor was angry with him because students were leaving Unity to follow Skinner to his new martial arts studio. Thereafter, several attempts were made on Skinner's life. Intervenor was initially arrested in connection with the attempts on Skinner on a charge of conspiracy to commit murder for hire. This charge against intervenor was dropped for lack of evidence.

Skinner gave extensive testimony concerning intervenor's involvement in the distribution of cocaine. Skinner stated he had on numerous occasions seen intervenor deliver cocaine to James Pearson and Jerry Rhome at the karate studio. He stated that Pearson and Rhome often gave intervenor money in exchange for the cocaine and sold the cocaine to third parties. Skinner also testified that intervenor sold cocaine to him on several occasions. Skinner stated that he accompanied intervenor on occasions when intervenor made deliveries of what Skinner believed to be cocaine. On one occasion when Skinner tried to interest intervenor in an investment in the music business, Skinner said, intervenor told him, "I don't know anything about any damn music. All I know is how to make money from drugs. I'm a dealer. That's all I do." On another occasion, Skinner testified, intervenor said that because his investments

in "straight" enterprises weren't panning out he should stick to just doing what he knows how to do best, which was deal drugs. Skinner said that intervenor had talked with him in general terms about his dealings with a narcotics supplier in Miami. Once in the mid–1970's, Skinner said, he saw intervenor in the basement of his home with a long work table which was covered with stacks of cash. He stated that intervenor told him that he guarded the cash with a submachine gun.

The intervenor testified during a deposition that he owned the defendant currency, but had not resided in the house on Pinehurst. He said he had brought the money into the house during 1984. He refused on fifth amendment grounds to answer questions concerning the source of the money or his income.

The evidence shows that intervenor made very large expenditures during the period of 1975 through 1984. He invested hundreds of thousands of dollars in businesses and purchased a home worth $200,000. The level of intervenor's expenditures during this period greatly exceeded his legitimate sources of income. It is thus apparent that intervenor had an additional, illegal source of income during this period. The evidence points to that illegal source of income being the sale and distribution of cocaine. Further evidence that intervenor had an illegal source of income is found in the fact that he stored a large amount of cash, most of which was in the form of bills in small denominations, in a residence and in close proximity to weapons. In addition, intervenor used assumed names and has failed to introduce any evidence which would give an alternative explanation for his source of income. His 1984 federal income tax return reported "Fifth Amendment Income."

The evidence also indicates that intervenor's illegal source of income was the distribution of cocaine.

The intervenor argues that the only evidence which clearly indicates intervenor distributed cocaine is the testimony given, by Skinner, and Skinner's testimony is not credible. As intervenor notes, Skinner was addicted to cocaine at the time he was involved with Unity. Intervenor arranged for him to go to a psychiatrist and gave or advanced him money to pay for psychiatric treatment. Skinner testified in this action pursuant to a grant of immunity. Also, intervenor pointed to the testimony of Jerry Rhome that Skinner had a poor reputation in the community regarding truthfulness and that Skinner had supported his cocaine addiction by stealing from Unity.

While the record contains certain evidence which tends to undercut Skinner's reliability as a witness, when taken as a whole along with other evidence in the record, his testimony is worthy of credence. It is significant to note that Skinner's testimony is corroborated in part by the other evidence. For example, Skinner's testimony that intervenor distributed cocaine through Jerry Rhome is corroborated by the statements Rhome made to police officers Maples and Dillon. In addition, the facts that intervenor had an illegal source of income and that cocaine was found in his possession provide some general corroboration for Skinner's testimony that intervenor was a drug dealer.

## CONCLUSIONS OF LAW

Georgia law provides that:

(a) The following are subject to forfeitures:

&ast; &ast; &ast; &ast; &ast; &ast;

(6) All moneys ... furnished or intended to be furnished by any person in exchange for a controlled substance or marijuana in violation of [Georgia's criminal provisions concerning controlled substances], all proceeds traceable to such an exchange, [and] all moneys ... used to facilitate any violation of [Georgia's criminal provisions concerning controlled substances].

&ast; &ast; &ast; &ast; &ast; &ast;

(f)(2)(A) Money and currency which is forfeited or which is realized from the sale or disposition of forfeited property shall after payment of all costs of court vest in the local political subdivision whose law enforcement officers

seized it. . . . If the money, currency, or property was seized by a county law enforcement agency, then the money, currency, or proceeds shall vest in that county. O.C.G.A. § 16–13–49 (Michie 1984 & Supp. 1987). Posession of cocaine, possession of cocaine with intent to distribute, trafficking in cocaine, and delivery, distribution, dispensation, and sale of cocaine are violations of Georgia's criminal provisions concerning controlled substances. O.C.G.A. §§ 16–13–21, –26(1)(D), –30, & –31 (Michie 1984 & 1987 Supp.) Thus, the defendant currency in this case is subject to forfeiture if it was used or intended to be used to purchase cocaine or was the traceable proceeds of purchases of cocaine.

The plaintiff in this type of forfeiture action has the initial burden of presenting a prima facie case that the defendant property is subject to forfeiture. *Morgan v. State*, 172 Ga.App. 375, 376, 323 S.E.2d 620 (1984). In order to meet this burden, the plaintiff must show by a preponderance of the evidence it presents that the essential elements of a controlled substances crime are present. *See Johnson v. State*, 156 Ga.App. 496, 497, 274 S.E.2d 837 (1980) (applying predecessor statute). The plaintiff must also show by a preponderance of the evidence it presents that the defendant property was substantially connected to the criminal activity. *See generally Monte Carlo Parties, Ltd. v. Webb*, 253 Ga. 508, 322 S.E.2d 246 (1984) (applying a different state forfeiture statute); *United States v. Four Million, Two Hundred Fifty–Five Thousand*, 762 F.2d 895, 902–04 (11th Cir. 1985), *cert. denied*, 474 U.S. 1056, 106 S.Ct. 795, 88 L.Ed.2d 772 (1986) (applying federal forfeiture statute).

As noted in the factual findings above, the plaintiff presented persuasive evidence that intervenor sold cocaine on numerous occasions, both in person and through intermediaries. This evidence satisfies the essential elements of the crime of selling cocaine. *See* O.C.G.A. § 16–13–30 (Michie 1984); *Thomas v. State*, 184 Ga.App. 318, 318, 361 S.E.2d 280 (1987); *Hubert v. State*, 181 Ga.App. 684, 684, 353 S.E.2d 612 (1987); *Bagby v. State*, 178 Ga.App. 282, 284, 342 S.E.2d 731 (1986).

The plaintiff's evidence shows that proceeds from the sale of cocaine were intervenor's primary source of income. The drug activities on the part of the intervenor covered a long period of time and continued until the money involved in the instant case was seized. Also, the plaintiff's evidence indicates that intervenor had in the past stored a large quantity of small denomination bills in his residence. It therefore appears on the basis of the plaintiff's evidence more likely than not that the defendant currency was either money intervenor received as profits from his sales of narcotics or money he intended to use to purchase narcotics for resale. Based on the evidence plaintiff presented, the court concludes that plaintiff has carried its burden of showing that the defendant currency is subject to forfeiture.

Once the plaintiff has met its initial burden of presenting a prima facie case, the burden shifts to the intervenor to show that the seized property is not subject to forfeiture. *Morgan*, 172 Ga.App. at 376, 323 S.E.2d 620. Intervenor has failed to present evidence to counter the plaintiff's case. Intervenor has not offered any evidence which would supply an alternative explanation for his apparent income level and his accumulation of the disputed currency.[4] A preponderance of the evidence presented thus shows that the defendant currency is subject to forfeiture. Accord-

---

**4.** It would arguably be permissible to draw negative implications from intervenor's invocation of the fifth amendment privilege against self-incrimination. Although the invocation of this privilege during a criminal prosecution cannot be held against a defendant, some precedent indicates that when a party to a civil action asserts his privilege against self-incrimination the finder of fact may draw an adverse inference from his silence. *See Baxter v. Palmigi-*

*ano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976); *Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509, 520–22 (8th Cir.1984); *Simpson v. Simpson*, 233 Ga. 17, 20, 209 S.E.2d 611 (1974). It is unnecessary to decide this issue in this case, however, as sufficient evidence exists to support a finding for the plaintiff even if no inference is drawn from intervenor's silence.

ing the court concludes that the defendant currency is subject to forfeiture.

## CONCLUSION

In view of the foregoing, judgment is entered in favor of the plaintiff and against intervenor and the lien of the United States. The defendant currency shall be distributed in the manner specified in O.C. G.A. § 16–13–49(f)(2)(A). Within five (5) days of this order, the attorney for the plaintiff is DIRECTED to prepare and file a proposed judgment and provide copies of the same to other attorneys in the case. The motion by the plaintiff to reopen evidence is DENIED.

SO ORDERED.