

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-14-2002

# Betterbox Comm Ltd v. BB Tech Inc

Precedential or Non-Precedential: Precedential

Docket No. 01-2456

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Betterbox Comm Ltd v. BB Tech Inc" (2002). *2002 Decisions.* Paper 500.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/500

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed August 13, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-2456

BETTERBOX COMMUNICATIONS LTD

v.

BB TECHNOLOGIES, INC.;
BLACK BOX CORPORATION,

Appellants

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

(Dist. Court No. 98-CV-702)
District Court Judge: Honorable Donetta W. Ambrose

Argued: May 7, 2002

Before: NYGAARD, ALITO, and ROSENN, Circuit Ju dges.

(Opinion Filed: August 13, 2002)

ANTOINETTE R. STONE (Argued)
ELLEN E. FARINA
Buchanan Ingersoll, P.C.
11 Penn Center, 14th Floor
1835 Market Street
Philadelphia, PA 19103-2985


MICHAEL L. DEVER
BRYAN H. OPALKO
Buchanan Ingersoll, P.C.
One Oxford Center, 20th Floor
301 Grant Street
Pittsburgh, PA 15219-1410

 Counsel for Appellants

MARK SCHONFELD (Argued)
HILLEL I. PARNESS
Brown Raysman Millstein Felder
 & Steiner, LLP
900 Third Avenue
New York, NY 10022

 Counsel for Appellee

OPINION OF THE COURT

ALITO, Circuit Judge:

This is an appeal in a declaratory judgment action commenced by Betterbox Communications, Ltd. ("Betterbox"), against Black Box Corporation ("Black Box") and a wholly owned subsidiary. Betterbox and Black Box sell competing computer-related products through catalog marketing. In 1995, Betterbox, a British company, applied to the United States Patent and Trademark Office ("PTO") for trademark registration based on its intended use of the Betterbox name and box design in the United States. Black Box objected that Betterbox's name and box design infringed on its trademarks. Betterbox then brought this action in federal court seeking a declaration of no infringement, and Black Box counterclaimed for trademark infringement, unfair competition, and trademark dilution. After a trial, the jury returned a verdict for Betterbox, and the District Court entered judgment accordingly on November 16, 2000. In post-trial orders, the District Court denied Black Box's motions for a new trial under Fed. R. Civ. P. 59(a) and for relief from judgment under Fed. R. Civ. P. 60(b). This appeal followed.

2

On appeal, Black Box argues that the District Court erred in admitting the testimony of Betterbox's expert witness, in admitting evidence of Betterbox's trademark registrations in foreign countries, and in refusing to grant relief from the judgment based on newly discovered evidence. We review these rulings for an abuse of discretion. See In re Cendant Corp. Prides Litig., 234 F.3d 166, 170 (3d Cir. 2000); Abrams v. Lightolier Inc., 50 F.3d 1204, 1213 (3d Cir. 1995). We affirm.

I.

Betterbox and Black Box each sought to introduce the testimony of an expert witness on the following question: whether there was a likelihood that consumers would be confused by the Betterbox and Black Box marks. Each side also filed a pre-trial motion in limine to exclude the other's expert, but the District Court permitted both experts to testify.

A.

Black Box argues that the District Court erred because Betterbox's expert, John Schulte, lacked the qualifications needed by an expert. The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which requires an expert witness to have "specialized knowledge" regarding the area of testimony. "The basis of this specialized knowledge 'can be practical experience as well as academic training and credentials,' " and"[w]e have interpreted the specialized knowledge requirement liberally." Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998) (citation omitted). However, " 'at a minimum, a

proffered expert witness . . . must possess skill or knowledge greater than the average layman . . . .' " Id. (citation omitted). See also, e.g., Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000).

In the present case, the District Court did not abuse its discretion in ruling that Schulte's practical experience sufficed under this liberal test. Schulte had worked actively for 20 years in the field of direct marketing and mail-order catalogs. He had extensive experience in "marketing and

the use of logos and how they are used in the marketplace as far as advertising." Appendix at 317. As the chairman of the National Mail Order Association, he had consulted with the Association's members on how to market through catalogs, had edited the Association's publication Mail Order Digest, and had reviewed and analyzed about 10,000 catalogs in the previous five years. He had published a variety of articles on direct marketing, had taken courses in graphic design, and had designed corporate logos. Schulte even had about four years' experience as the owner of a business involved in the direct marketing of computer products.

Black Box argues that Schulte's experience with respect to the marketing of computers was insufficient because he had worked in that specific field for only four years and because that experience had preceded the time of the trial by eight years. See Appellant's Br. at 17. This argument is not persuasive. Four years of experience at the helm of a company is substantial, and Black Box has not explained why the passage of eight years between that period and the commencement of the trial diminished Schulte's qualifications. If Schulte had been called to testify as an expert regarding a field of knowledge that had changed greatly during the past few years, Black Box's argument might have force, but Black Box has not called to our attention any such changes regarding the question whether the competing marks in this case created a likelihood of confusion.

Black Box also faults Schulte's experience because it did not concern "the catalog marketing of electronic data communications and computer connectivity products." Id. at 18. As noted, however, Schulte had extensive experience in catalog marketing, as well as four years of experience marketing computer products. Black Box has not pointed out anything that is fundamentally different about the catalog marketing of "data communications and computer connectivity products" as opposed to other computer products. Id. Thus, Schulte's lack of experience in marketing the precise type of computer components sold by these companies does not establish that the District Court abused its discretion in ruling that his qualifications met the standard of Rule 702.

Black Box argues, finally, that Schulte did not have experience in evaluating the so-called Lapp factors that we have found to be useful in determining whether there is a likelihood of confusion between marks. See Interspace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983); A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc. , 237 F.3d 198, 210-15 (3d Cir. 2000). These factors, however, are not mandatory; they "are meant to be tools, not hurdles." A & H Sportswear, 237 F.3d at 214. Schulte's experience plainly related to a number of the Lapp factors, namely, factors (1), (3), (7), (8), and (9). For all these reasons, we see no basis for disturbing the District Court's determination regarding Schulte's qualifications.

B.

Black Box also argues that Schulte should not have been allowed to testify as an expert because his methodology was deficient. In Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592-93 (1993), the Supreme Court held that under Rule 702 the trial judge must make "a preliminary assessment of whether the reasoning or methodology underlying the [expert's] testimony is scientifically valid." The Court noted factors relating to the reliability of an expert's scientific methodology, including whether the theory or technique "can be (and has been) tested," whether it "has been subjected to peer review and publication," whether the known or potential error rate is acceptable, and whether it is generally accepted within a relevant scientific community. Id. at 593-94. But the Court stressed that "[t]he inquiry envisioned by Rule 702 is. . . a flexible one." Id. at 594.

In Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149-50 (1999), the Court held that the basic gatekeeping function described in Daubert applies to all expert testimony, not just "scientific" testimony. But the Court added that in cases not involving scientific testimony, " '[t]he factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.' " Id. at 150 (citation omitted). In such cases, the Court said, "the relevant reliability concerns may focus

upon personal knowledge or experience." Id . In addition, the Court made it clear that a court of appeals is to apply an abuse-of-discretion standard, not only to a trial court's ultimate decision to admit or exclude expert testimony, but to "the trial court's decision about how to determine reliability." Id. at 152.

In the present case, Schulte's testimony was based on his "personal knowledge or experience," Kumho Tire, 526 U.S. at 150, rather than a methodology that satisfies the Daubert factors. Schulte testified that he examined the

companies's catalogs, that he informally surveyed colleagues, and that he evaluated the catalogs' target market. In his report, he stated that he focused on the following factors: "[t]he perception of the names," "[t]he sophistication of the target audience/market,""[t]he graphic logo design," and "[t]he presence in the market place and the look and feel of the catalogs." Appendix at 86. Although he did not consider all of the factors that we noted in A & H Sportswear, his analysis tracked many of them.

In order to hold that the District Court erred in admitting Schulte's testimony, we would have to conclude that the District Court abused the considerable discretion that it enjoyed to determine the criteria for judging reliability under the particular circumstances present here. We find it unnecessary, however, to decide this question because we are convinced that even if the District Court erred, the error was harmless.

In a civil case, an error is harmless if it is highly probable that it did not affect the complaining party's substantial rights. See McQueeny v. Wilmington Trust Co., 779 F.2d 916, 924, 926 (3d Cir. 1985). Under this standard, the admission of Schulte's testimony, even if erroneous, was harmless. Our reading of the record reveals that Betterbox did not rely heavily on that testimony. For example, in his closing, Betterbox's attorney made only a passing reference to Schulte, suggesting that the jury consider that testimony in conjunction with its own common sense. See Appendix at 792. In addition, the simplicity of Schulte's methodology diminished the likelihood that it unduly swayed the members of the jury. The jurors were able to examine the

6

marks themselves and consider whether, under the instructions given by the court, they were confusingly similar. The testimony of Black Box's expert, William Dean, must also be considered. Dean testified for Black Box on likelihood of confusion, and his qualifications and methodology were nearly indistinguishable from Schulte's. Dean's methodology was even simpler than Schulte's. He did not conduct any survey but instead, relying on his experience, he examined the competing catalogs and rendered an opinion of likely confusion.

The District Court, as noted, admitted the testimony of both experts. If the District Court had agreed with Black Box's arguments regarding Schulte's testimony, it would have been compelled to exclude Dean's testimony as well. We see no reason to believe that Schulte's testimony was any more convincing than Dean's, and Black Box has not offered any such reason. Taking all these factors into account, we are convinced that any error in admitting Schulte's testimony was harmless.

II.

At trial, Betterbox introduced evidence of its existing trademark registrations in Canada, the United Kingdom, and the European Union. Black Box argues that this evidence was irrelevant and highly prejudicial and therefore should not have been admitted. First, Black Box contends that because trademark law is territorial in nature, evidence about Betterbox's trademarks in countries other than the United States was irrelevant. Second, Black Box maintains that this evidence prejudiced the jury by creating "a false impression that Betterbox had obtained rights in and to the Betterbox name and box design in the United States by virtue of having used and registered its trademarks outside the United States." Appellant's Br. at 24 (emphases added).

We are not persuaded by Black Box's arguments. Below, Black Box had asserted that Betterbox was attempting intentionally and in bad faith to trade off Black Box's name. Black Box also had alleged actual trademark confusion among consumers in Europe. See Appendix at 41, 384,

470, 761. In response, Betterbox sought to introduce evidence that it was using its trademarks in Europe lawfully. This evidence was relevant, i.e., it had a tendency to prove good faith. The District Court ruled this evidence admissible because it was "precisely this type of evidence which is relevant to [Black Box's] allegations of willful or intentional conduct." Appendix at 74.[1] We agree. We also see no basis for disturbing the District Court's refusal to exclude this evidence under Federal Rule of Evidence 403. The District Court had broad discretion in ruling on the Rule 403 request, see e.g., United States v. Lopez, 271 F.3d 472, 482 (3d Cir. 2001), and we note that the Court gave a limiting instruction regarding this evidence. See Appendix at 754.

III.

Black Box's final argument is that the PTO's cancellation of Betterbox's trademark registration a few weeks after trial constitutes "newly discovered evidence" that entitled Black Box to relief from the judgment under Fed. R. Civ. P. 60(b).

Betterbox's application for registration succeeded shortly after Black Box apparently ceased to oppose the application. The PTO issued to Betterbox Registration No. 2,288,337 on October 26, 1999. According to counsel for Black Box, an employee of counsel's firm spoke by telephone to a PTO official shortly before the trial began on November 13, 2000. The official reportedly stated orally that the Betterbox registration had been inadvertently issued and would be canceled but that the PTO could not locate the Betterbox file at that time.[2]

---

1. This evidence could reasonably be admitted to show that Betterbox's intent in entering the United States was not to poach on Black Box's

established mark but rather to build on Betterbox's own goodwill, already accumulated in other countries.

2. Several weeks after the conclusion of the trial, the PTO finally found the file of Black Box's opposition, which the PTO had been unable to locate throughout the trial. In the cancellation notice, dated December 8, 2000, the PTO offered a chronology of the proceedings concerning Betterbox's trademark. See Appendix at 162-64.

Black Box moved in limine to exclude the Betterbox certificate of registration. The District Court stated that it was inclined to exclude the certificate if it received "some sort of official writing from the Patent Office-- that this registration is going to be recalled or revoked." Appendix at 379. However, without such a writing, the Court stated, the registration certificate would be admissible. See id. No such writing was produced, and the Court admitted the certificate. On December 8, 2000, about three weeks after trial, the PTO issued a notice that Betterbox's application would be forwarded to the Commissioner of Trademarks "for cancellation of inadvertently issued Registration . . . and [for] restoration to pending application status." Appendix at 164.

Under Rule 60(b), newly discovered evidence must be evidence that "by due diligence could not have been discovered in time to move for a new trial under[Fed. R. Civ. P. 59(b)]." In addition, the evidence must be "evidence of facts in existence at the time of trial." Bohus v. Beloff,

---

In July 1997, Black Box filed with the PTO a notice of opposition (Opposition No. 107,801) against Betterbox's application for trademark registration (Serial No. 75/011,373). Betterbox timely filed its answer. In June 1999, the PTO ordered Black Box to show cause why it had failed to file its brief. Then the alleged rupture in communication occurred. Black Box claims it sent a response to the PTO on July 7, 1999. "For reasons unknown to the [PTO's Trademark Trial and Appeal] Board," this response was not "associated with the file" at the PTO until after the trial. Appendix at 164. Apparently unaware of any response from Black Box, the PTO ordered dismissal with prejudice of Black Box's opposition. Six days later, on August 26, Black Box allegedly sent the PTO a response to the dismissal order, but this response was likewise inexplicably "not associated with the file." Appendix at 164.

Following the perceived cessation of opposition, the PTO issued Betterbox its registration in October 26, 1999. Exactly a year later, in preparation for trial, Black Box faxed copies of its two responses (dated July 7 and August 26) to the PTO. Unfortunately, the PTO was unable to locate Black Box's opposition file in its warehouse until several weeks after trial. On December 8, 2000, the PTO ordered Betterbox's registration canceled as "inadvertently issued" and restored the application to "pending" status. Appendix at 164.

950 F.2d 919, 930 (3d Cir. 1991); see also United States v. Jasin, 280 F.3d 355, 362 (3d Cir. 2002) (criminal case).

Because newly discovered evidence must concern facts in existence at the time of trial, the notice of cancellation of the Betterbox registration cannot qualify as newly discovered insofar as it simply shows that the Betterbox registration was canceled. This is so because the fact of cancellation was not in existence at the time of trial. Recognizing this, Black Box suggests that the post-trial cancellation shows that, at the time of trial, the PTO had already decided to cancel the Betterbox registration but had simply not yet done so due to administrative delay. However, the December 8 notice of cancellation does not reveal that a decision to cancel had been made at the time of trial.3

Furthermore, even if such an internal decision had been made, Black Box has not shown that it exercised due diligence in attempting to obtain evidence of such a

_____

3. We note the future tense of the December 8 notice, stating that Betterbox's file "will be forwarded . . . for cancellation." Appendix at 164. Moreover, we cannot infer that the mere filing of Black Box's opposition prior to trial rendered cancellation a fact in existence during the trial.

A party that disputes the right of another to register its mark can resist at two stages of the administrative process: (1) after the application (by filing an opposition) or (2) after registration occurs (by filing a petition to cancel). Filing an opposition, as Black Box did here, does not automatically nullify a trademark application. Instead, the filing initiates an adversarial process that is adjudicated by the PTO's Trademark Trial and Appeal Board.

To successfully prosecute an opposition, the opposer has the burden of proving two elements: (1) standing, i.e., the opposer will likely be damaged by the registration, and (2) valid grounds why the applicant is not entitled to register the mark it claims. See J. Thomas McCarthy, McCarthy on Trademarks and Unfair CompetitionS 20:1 et seq. (4th ed. 2001); Siegrun D. Kane, Trademark Law: A Practitioner's Guide S 18 (3rd ed. 2000). Similarly, filing a petition to cancel does not automatically cancel a trademark's registration; the opposer has the same burden of proving analogous elements. See id. Even if the proceeding results in a cancellation, the cancellation does not typically have retroactive effect. Absent contrary direction from the PTO, the registration was valid until canceled.

10

decision. Black Box did not attempt to depose or subpoena anyone from the PTO. We suspect, as Black Box argues, that the PTO would have refused to provide any evidence about an internal decision that had not been officially released, but the fact remains that Black Box did not take the obvious steps that would have demonstrated this.

Black Box also did not ask for a trial continuance for the purpose of obtaining evidence that cancellation was

imminent. We would view this appeal differently if the District Court had denied a continuance and admitted the Betterbox registration despite a credible proffer that the PTO was in the process of canceling that registration. But that is not what occurred.

We review the denial of Black Box's Rule 60(b) motion for abuse of discretion. See In re Cendant Corporation Prides Litigation, 234 F.3d 166, 170 (3d Cir. 2000)." `[W]e will not interfere with the [D]istrict [C]ourt's exercise of discretion unless there is a definite and firm conviction that the court . . . committed a clear error of judgment.' " Id. (citation omitted). Under this standard, we cannot overturn the District Court's ruling.

IV.

For the foregoing reasons, we affirm the judgment of the District Court.

ROSENN, Circuit Judge, dissenting:

I believe the District Court committed reversible error in admitting the testimony of Betterbox's sole expert witness, John D. Schulte, and in refusing to grant relief from the judgment based on newly discovered evidence. I, therefore, respectfully dissent.

I.

A brief statement of the background of this declaratory judgment action may provide perspective. Black Box Corporation (Black Box) is a corporation organized under Delaware law with its principal place of business in Pittsburgh, Pennsylvania. It has been in the business of selling computer-related products and services throughout the United States and in foreign countries, primarily through its catalogs. Since commencement of its operations in 1976, it has utilized the Black Box name and its Black Box design in marketing its products, catalogs, vehicles and marketing materials. Between 1978 and 1985, the United States Patent and Trademark Office (USPTO) issued it registrations for the Black Box name and box design. As of the end of the fiscal year 2000, it posted $500 million in revenues.

Betterbox Communications, Ltd. (Betterbox) is a corporation organized under the laws of the United Kingdom with its principal place of business in Keynes, England. Founded in 1988 by Horacio Baioes, a former Black Box manager, the company obtained a trademark registration for the mark "Betterbox" in the United Kingdom. In 1995, Betterbox decided to enter the American market and applied for trademark registration with the USPTO based on its intended use of the Betterbox name and box design in the United States. Betterbox and Black Box sell competing products in the same channels of trade,

marketing them through the use of catalogs. Sensing that Black Box would oppose its entry into the American market, Betterbox organized a corporation known as Performance Communications, Inc. This corporation, also with headquarters in Pittsburgh, Pennsylvania, sells the same products as the parties to this litigation.

12

Black Box objected to Betterbox's application, complaining that the Betterbox name and box design infringed on Black Box's trademarks and demanded of Betterbox that it refrain from the use of the Betterbox name and box design. Betterbox filed this action for a declaratory judgment, which is now on appeal.

II.

Prior to trial, Black Box moved to exclude the testimony of John Schulte, Betterbox's expert, pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). The District Court denied Black Box's motion to exclude Schulte's testimony, finding him qualified to testify as an expert on the issue of whether there was a likelihood that customers would be confused by the Black Box and Betterbox names and box designs and that his opinion was sufficiently reliable to meet Daubert standards. The majority concludes that the District Court did not abuse its discretion in admitting Schulte's testimony primarily because of his practical experience "in the field of direct marketing and mail-order catalogs," and in the marketing and use of logos and their use as advertising. (Maj. op. at 3).

The undisputed issue before the District Court was whether there was a likelihood of confusion for customers in the same market served by these potential competitors using the Black Box and Betterbox names and box designs in the same channels of trade and advertising through the same media.

Infringement of a federally registered trademark is determined by the test of whether the use of the mark is "likely to cause confusion, or to cause mistake, or to deceive." J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, S 23.1 (4th ed. 2001) (internal quotations omitted).

The likelihood of confusion analysis requires the evaluation of a number of factors, ten of which were considered by this court in Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1229 (3d Cir. 1978), and reaffirmed in A & H Sportswear, Inc. v. Victoria's Secret

13

Stores, Inc., 237 F.3d 198, 215 (3d Cir. 2000). See also Ford Motor Co. v. Summit Motor Products, Inc., 930 F.2d 277, 293

(3d Cir. 1991). Among the factors considered in the analysis are the degree of similarity between the owner's mark and the alleged infringing mark, the strength of the owner's mark, the price of the goods and other factors indicative of the care and attention expected of consumers when making the purchase, the defendant's intent in adopting the mark, and the extent to which the targets of the parties' sales efforts are the same. Ford Motor, 930 F.2d at 293. The most important of these factors is the degree of similarity between the two names. See id.. Moreover,"[i]t is well-established that likelihood of confusion should be determined by viewing the two marks from the perspective of an ordinary consumer of the goods or services." Id. (internal quotations omitted).

Schulte, Betterbox's witness, was not qualified to testify as an expert in this case. He did not describe whether or how he considered any of the above factors. He could not articulate the methodology he used to arrive at his conclusions, every one of which was predicated upon his personal, unsupported, subjective belief. His testimony on cross-examination strikingly illuminates his lack of expertise on the issue of consumer likelihood of confusion. He testified:

> Q: Have you done any test mailings to determine the target market for either Black Box or Betterbox?
>
> A: No, I have not conducted any mailings for them.
>
> . . . .
>
> Q: But you haven't done any investigation to determine who Black Box's customers are, have you?
>
> A: Other than examining the products in their catalog, no.
>
> Q: So you don't even know who their customers are specifically?
>
> A: If I was to name them -- I couldn't name their customers. I could name the type of customers they are.

14

> Q: And you would name the type of customers based solely on the fact that you've looked at the products in the catalog, correct?
>
> A: Well, I have to use my common sense.
>
> Q: Well, is there any other basis for your statement that you know who the customers are?
>
> A: Besides what they are selling?

Q: Yes.

A: No.

Q: Are you an expert in trademark infringement?

A: No, I'm not.

Q: Are you an expert in determining likelihood of confusion?

A: I would say I'm not an expert in that, no.

Although the District Court held that Schulte's methodology exhibited a sufficient "degree of rigor," neither the Court nor Schulte explained what that methodology entailed. His cross-examination plainly shows that he had no methodology. Therefore, closer scrutiny than is customarily afforded under abuse of discretion review is appropriate here. United States v. Mathis, 264 F.3d 321, 338 (3d Cir. 2001) ("We find it difficult to accord the customary degree of deference to the District Court's discretion . . . because the District Court explained its ruling with little more than a series of conclusions.").

Although the standard for qualifying an expert witness is generally liberal, we pragmatically have recognized that the standard has some limits. To qualify as an expert,"Rule 702 requires the witness to have 'specialized knowledge' regarding the area of testimony." Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998). Although we have applied Rule 702 liberally, we have not permitted every proffered witness to qualify as an expert. Id.

The issue before the jury did not concern catalog marketing or even more specifically catalog marketing of electronic communications and computer connectivity

15

products. The specific question before the court and jury concerned trademark infringement and, in the words of Betterbox's counsel, "the issue of likelihood of consumer confusion." Furthermore, as counsel for Betterbox observed in their motion in limine argument to exclude Black Box's expert: "Market analysts exploring the question of consumer confusion in a specific market commonly conduct consumer confusion surveys. Even when they do not conduct a full scale survey, they define and research the demographics of consumers in the relevant market." Schulte admits he did not conduct any surveys. He acknowledged that "I'm not an expert" in determining the likelihood of confusion. His testimony was precisely the type of "subjective belief or unsupported speculation" disapproved by Daubert. 509 U.S. at 590. The District Court abused its discretion in allowing it.

In Aloe Coal Co. v. Clark Equipment Co., 816 F.2d 110, 114 (3d Cir. 1987), we held that a District Court abused its

discretion in allowing a tractor sales representative to testify as an expert regarding the cause of a tractor fire. Although we have not regarded academic training as a prerequisite for qualifying an expert witness, in order to qualify as an expert, he or she must possess skill or knowledge greater than the average layman. Id. at 114. A pediatrician is not an expert in orthopedics merely because both are doctors in medicine; a pulmonologist cannot claim to be an expert as a pharmacologist and a toxicologist as well as a physician. See Diaz v. Johnson Matthey, Inc., 893 F. Supp. 358, 373 (D.N.J. 1995).

In Waldorf, we cited several Third Circuit district court cases in which witnesses were disqualified from providing expert testimony. 142 F.3d at 625-26. Although academic training is not essential, and practical experience may qualify a person as an expert witness, an expert in this case must have "specialized knowledge" in the area of likelihood of confusion in trademarks. Schulte acknowledges he had none. At the Daubert hearing, he testified that his experience was limited to the catalog marketing industry and his expertise was in knowing how people shop in catalogs. As for experience in the computer industry, he owned a company that for four years sold

16

computers and computer components. Schulte, however, points to nothing in that experience that provided him with expertise in determining the likelihood of consumer confusion in the purchase of similarly named computer products that are similarly marketed.

The majority concludes that even if the court erred in admitting Schulte's testimony, the error was harmless because Betterbox did not rely heavily on that testimony. It reasoned that, in addition, "the simplicity of Schulte's methodology diminished the likelihood that it unduly swayed the members of the jury." However, Schulte's methodology not only was not simple, but, as he concedes, there was no methodology. Furthermore, whether Betterbox relied heavily on his testimony is speculative, as is the conclusion that his lack of methodology likely did not influence the jury. We have no way of calibrating the degree of jury reliance on Schulte's testimony. The weight afforded Schulte's testimony can be calculated only by the jurors, not by the judges. As Betterbox's only expert witness on an esoteric question regarding the likelihood of consumer confusion in trademark infringement, Schulte's testimony was crucial. Therefore, allowing an unqualified witness to testify as an expert in this case cannot be dismissed as harmless error.

Nor is the "harmless error" rationale fortified by the majority's observation that Black Box's expert's qualifications and methodology were nearly indistinguishable from Schulte's. If that were true, and there is no evidence that it is, it only compounds the error, because the jury then would have been beset by two

unqualified witnesses portrayed as experts. The District Court's original error in permitting Schulte to testify as an expert is not dissipated by allowing an allegedly unqualified expert to testify for Black Box. Moreover, the burden of proof was on Betterbox, who brought the suit, and the District Court erred in the standard it first set for qualifying Betterbox's expert witness. The error was not harmless.1

_____

1. I concur with the majority's conclusion that the admission of Betterbox's evidence of its existing foreign trademark registrations was not error because this ruling is premised on the evidence's relevance in

II.

I also believe the District Court erred in not granting Black Box's motion for relief from the judgment under Federal Rule of Civil Procedure (F.R.C.P.) 60(b) on the basis of newly discovered evidence. A major pillar of Betterbox's case to the jury consisted of proof of the certification of registration by the USPTO of the Betterbox and design mark. However, Black Box was not informed until a few days before trial that Betterbox intended to add the Certificate of Registration to its exhibit list. Black Box promptly filed a motion in limine to exclude it on the ground that it had been inadvertently issued. The motion was denied because Black Box could not prove the cancellation of the Certificate of Registration. Equally, if not more important, it could not prove that the certificate had been issued erroneously.

Betterbox presented the certificate to the jury during the trial and focused on it during its opening and closing arguments to the jury. Counsel for Betterbox specifically argued in his summation that in analyzing the likelihood of confusion, he wanted the jury to consider "that the United States Government has given its opinion on this issue. As I showed you yesterday, the United States of America has issued a certificate of registration." Horacio Baioes testified that the Certificate of Registration issued to Betterbox in 1999 by the United States Patent Office "authorized me to use my logo and trademark wherever it was registered."

Counsel for Betterbox further informed the jury that the Certificate of Registration says "that the application . . . for

_____

rebutting Black Box's contention that Betterbox, by entering the United States market, intended to trade on Black Box's goodwill. In ordinary trademark litigation, however, evidence of foreign registrations is irrelevant. See, e.g., Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha, 754 F.2d 591, 599-600 (5th Cir. 1985) (holding general principles of trademark law compelled conclusion that admission into evidence of foreign trademark practices was error); Double J of Broward Inc. v. Skalony Sportswear GmbH, 21 U.S.P.Q.2d 1609, 1612 (1991) ("Information concerning applicant's foreign activities, including foreign trademark applications and/or registrations, is not relevant to the issues

in an opposition proceeding.").

the trademark . . . was examined and determined to be in compliance with the requirements of the law and with the regulations prescribed by the director of the United States Patent and Trademark Office." He further reminded the jury of the Court's instructions concerning "a presumption arising from . . . Betterbox's mark, and here is Betterbox's registered trademark from Washington, D.C. So that's another indicator . . . you have the United States Government as well issuing a certificate of registration."

The Trial Court instructed the jury that it should consider the registration of the trademark "in determining whether Betterbox has a protectable trademark right in the Betterbox and design mark." It further informed the jury: "Because Betterbox's trademark has been registered, there is a presumption that Betterbox has a protectable trademark right and that [Betterbox] . . . is entitled to use the Betterbox and design mark exclusively on its data communications products."

The prejudicial effect on the jury of the instructions and the foregoing argument to the jury is demonstrated by one of the first questions from the jury. The jury inquired whether "the trademark depicted in the U.S. certificate of registration [is] the trademark that Betterbox will use [in] the shaded box on the catalog?" Black Box asserts that the jury's question demonstrates that it accepted Betterbox's closing argument to reach the erroneous conclusion that the United States Patent Office had already declared that the Black Box and Betterbox marks were not confusingly similar "and that Betterbox was authorized by the Trademark Office to use the design shown in the . . . registration."

Betterbox's argument, the instructions to the jury, and Baioes's testimony were boldly predicated upon a valid trademark registration by the United States Patent Office of Betterbox's name and logo design. However, there was no valid trademark registration. On December 8, 2000, more than ten days after the verdict, the USPTO officially acknowledged that the registration to Betterbox had been issued erroneously. The series of mistakes that led to the improvident issuance of the registration are described by the majority in its third footnote and in the Order vacating

the judgment authorizing the registration. Thus, Betterbox had no right whatsoever in the name and logo at the time of trial or since. It was not entitled to any presumptive protectable trademark right; it was not "entitled to use the Betterbox and design mark exclusively on its . . . products."

Under Rule 60(b), a court may relieve a party from a final

judgment because of newly discovered evidence that could not have been discovered in time to move for a new trial under Rule 59(b). The Rule requires that the evidence be discovered after trial and the failure to learn of it must not have been caused by a lack of diligence. Stridiron v. Stridiron, 698 F.2d 204, 207 (3d Cir. 1983). The evidence must be material to the issues involved, not merely cumulative, and of such a nature that it probably would change the outcome of the litigation. Id. The majority rejects the Certificate of Cancellation as newly discovered evidence "because the fact of cancellation was not in existence at the time of trial." (Maj. op. at 10).

The requirement that the newly discovered evidence be in existence at the time of trial does not mandate that"the fact of cancellation" exist at the time of trial. A critical issue at the trial was whether Betterbox possessed a valid Certificate of Registration from the USPTO. The newly discovered evidence relating to this fact is the USPTO Order of December 8, 2000, vacating its default judgment. The actual notice of cancellation, although not in existence at the time of trial, was simply ministerial. Thus,"the crucial question should not be when the evidence was created, but whether the evidence was of facts that were in existence at the time of trial. Evidence should meet the newly-discovered evidence test even if it did not come into existence until after the trial, so long as the evidence is of facts that were in existence at the time of trial." 12 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE S 60.42[3][a] (3d ed. 2000); accord Nat'l Anti-Hunger Coalition v. Executive Comm. Etc. , 711 F.2d 1071, 1075 n.3 (D.C. Cir. 1983).

However, Black Box maintained at trial that this Certificate of Registration was inadvertently issued on the basis of an erroneous default judgment entered by the USPTO. Counsel for Black Box informed the Court that the USPTO could not provide any information concerning the

20

status of the Betterbox registration because it could not locate the file.

The majority asserts that Black Box did not exercise due diligence in attempting to obtain evidence of the USPTO decision and thus it "did not attempt to depose or subpoena anyone from the [US]PTO." On the contrary, Betterbox belatedly listed the Certificate of Registration as an exhibit in this case, several days before trial. Counsel for Black Box promptly communicated with the USPTO to ascertain the status of Betterbox's application for registration, only to learn that the file was missing and, therefore, no information was available. The majority states that Black Box, because it did not attempt to depose or subpoena someone in the USPTO, did not exercise due diligence. The majority acknowledges, however, that it "suspect[s] . . . the the [US]PTO would have refused" to comply with any such requests -- in other words, that such attempts by Black Box would have been futile. Due

diligence does not require exercises in futility, but only efforts reasonably calculated to bring about the desired result. Cf. Aron v. United States, 291 F.3d 708, 712 (11th Cir. 2002) ("Due diligence . . . does not require a prisoner to undertake repeated exercises in futility or to exhaust every imaginable option, but rather to make reasonable efforts."); United States v. Blanco, 861 F.2d 773, 778 (2d Cir. 1988) ("Due diligence does not require the government to pursue goals that are futile."). Therefore, under the circumstances, Black Box acted with due diligence in contacting the USPTO and attempting to acquire information regarding an internal decision that had not yet been made official.

Rule 60(b) is intended to preserve "the delicate balance between the sanctity of final judgment . . . and the incessant command of a court's conscience that justice be done in light of all the facts." Rosebud Sioux Tribe v. A & P Steel, Inc., 733 F.2d 509, 515 (8th Cir. 1984) (internal quotations omitted) (alteration in original); accord Coltec Indus., Inc. v. Hobgood, 280 F.3d 262, 271 (3d Cir. 2002) (Rule 60(b)'s general purpose is to reach proper balance between finality of litigation and justice). In Rosebud, the Court of Appeals reversed the District Court's denial of Rule

21

60(b) relief. The District Court found that the newly discovered evidence -- grand jury testimony - did not exist at the time of trial. 733 F.2d at 516. The appellate court found that at trial, the evidence of the witness's involvement in the alleged conspiracy was circumstantial. Id. The Court held that testimony taken after the entry of judgment revealing that perjurious deposition testimony was read into the record amounted to newly discovered evidence because the perjury existed at the time of trial. Id. at 516-517; accord Kettenbach v. Demoulas, 901 F. Supp. 486 (D. Mass. 1995) (after exhaustive review of Rule 60(b) decisions on newly discovered evidence, court held post-judgment recording of descriptions of events occurring before judgment is newly discovered evidence).

In this case, the trial court did not exercise discretion in deciding whether to grant Rule 60(b) relief. See Chilson v. Metro. Transit Auth., 796 F.2d 69, 70 (5th Cir. 1986). Instead, it held that Black Box was not eligible for relief under the Rule because it had not presented newly discovered evidence. Chilson involved an internal audit made by the defendant Transit Authority that strongly supported the movant's case that he had been wrongfully discharged by the Authority. The District Court held that the internal audit did not exist at trial and was thus not newly discovered evidence. Id. The Court of Appeals reversed, holding that the District Court erred as a matter of law by ruling that the proffered evidence of the internal audit and what it showed was not newly discovered evidence. Id. The Court reasoned that because the misconduct documented by the audit predated the verdict in favor of the defendant, the audit was newly discovered

evidence. Id. The misconduct at issue was in existence at the time of the original trial and the audit was deemed newly discovered evidence because it consisted of facts in existence at the time of the trial of which the movant was excusably ignorant.

Throughout the trial, Black Box consistently maintained that the Certificate of Registration had been issued inadvertently. On November 7, 2000, it moved in limine to exclude the Certificate of Registration, but it could not supply the necessary proof because the USPTO could not

22

locate the file opposing the grant of the certificate until early in December 2000, after the trial in this case had ended. The USPTO stated in its December 8, 2000, Order:

> For reasons unknown to the Board, the original July 7, 1999, and August 26, 1999, papers [Black Box responses to the USPTO Rule to Show Cause Order] have never been associated with the file. (Due to problems at the Patent and Trademark Office warehouse, the Board was unable to obtain the file of Opposition [ ] until early December 2000.)

On November 14, 2000, Black Box informed the court that the United States Patent Office still could not locate the file and, under the circumstances, it would not provide a statement on the status of the litigation. Until the Board located Black Box's opposition file, it could not vacate the erroneous judgment granting the Certificate of Registration. Therefore, on December 8, 2000, it ordered that"the Board's August 20, 1999, order entering judgment is hereby vacated." It simultaneously directed that the file be "forwarded to the Office of the Commission for Trademarks for cancellation . . . and restoration to pending application status." The cancellation of the certificate at this point was simply ministerial, the judgment granting the registration having been vacated.

This is a classic case calling for Rule 60(b) relief from the judgment on the ground of newly discovered evidence. It was discovered after trial and Black Box consistently endeavored to uncover it before and during the trial. The evidence that Betterbox had no valid Certificate of Registration was highly material and of a nature that it probably would change the outcome of the litigation. Granting the relief would be in the interest of fairness and justice.

Accordingly, I would reverse the judgment of the District Court and remand the case for a new trial.

A True Copy:
Teste:

> Clerk of the United States Court of Appeals
> for the Third Circuit