**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 16-3172 & 16-3263
_____

IN RE: PAULSBORO DERAILMENT CASES

Ronald J. Morris and Kristen Pickel,
                                   Appellants in 16-3172

Consolidated Rail Corporation,
                                   Appellant in 16-3263
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Nos. 1-13-cv-00784 & 1-13-cv-03244)
District Judge: Hon. Robert B. Kugler
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
April 13, 2018
_____

Before:  CHAGARES, VANASKIE, *Circuit Judges*, and BOLTON, *District Judge**

(Filed: August 15, 2018)
_____

OPINION**
_____

---

* The Honorable Susan R. Bolton, Senior United States District Judge for the District of Arizona, sitting by designation.

** This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

VANASKIE, *Circuit Judge.*

After being exposed to the toxic chemical vinyl chloride, Appellant/Cross-Appellee Robert Morris ("Morris") filed suit against Appellee/Cross-Appellant Consolidated Rail Corporation ("Conrail") seeking recovery of damages for, among other things, medical monitoring and emotional distress from fear of cancer.[1]  The District Court dismissed those damage claims on summary judgment after determining that Morris's medical expert failed to proffer a sufficiently reliable causation methodology under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Morris's case then proceeded to trial on his negligence claim, and the jury ultimately awarded him $500 for pain and suffering and emotional distress.

On appeal, Morris argues that the District Court abused its discretion in excluding his expert's testimony, error that in turn caused the District Court to reject his medical monitoring and fear of cancer claims.  Conrail, meanwhile, maintains that the District Court should not have allowed the jury to hear Morris's negligence claim absent expert testimony, and thus erred in denying Conrail's post-trial motion for judgment as a matter of law.  Because a review of the record reveals that the District Court did not commit any of the errors imputed to it by the parties, we will affirm on all grounds.

I.

---

[1] Kristen Picket, Morris's wife, joined the suit seeking damages for loss of consortium.  The jury ruled in Conrail's favor on this claim, a ruling that is not challenged on appeal.

On the morning of November 30, 2012, a freight train hauling fifty-five tank cars derailed while crossing a swing bridge in Paulsboro, New Jersey. Several of the cars—one of which was carrying the toxic chemical vinyl chloride—subsequently plunged into the Mantua Creek coursing beneath the bridge. As a result of the derailment, some 20,000 gallons of the chemical were released into the atmosphere.

Morris was on his way to work at the time of the accident. As he approached the derailment scene, he found himself enveloped in a cloud of vinyl chloride that had permeated the surrounding area. His exposure to the chemical allegedly caused him to suffer various short- and long-term symptoms in the days and weeks that followed, and on May 23, 2013, Morris filed suit against Conrail.[2]

To support his claims, Morris retained Dr. Omowunmi Osinubi, who was tasked with determining (1) "whether . . . Morris [had] any medical conditions from exposure[] to vinyl chloride" and (2) "whether . . . a medical monitoring program [should be] recommended" based on that exposure. (JA 2321.) Dr. Osinubi prepared several reports, which, taken together, concluded in relevant part that Morris faced an increased risk of liver cancer due to exposure to vinyl chloride, and that he needed annual weight-loss and lifestyle coaching to reduce that risk. (*Id*. at 2307–08, 2412.)

Prior to trial, Conrail moved *in limine* to exclude Dr. Osinubi's testimony on the ground that her increased-risk-of-cancer methodology was not sufficiently reliable under *Daubert*. To address Conrail's motion, the District Court convened a *Daubert* hearing on

---

[2] A number of persons filed suit as a result of the derailment and consequent release of vinyl chloride. Only Morris's claim is before us now.

3

August 6, 2015. At the hearing, Conrail proffered two medical-causation experts—Dr. Douglas Weed and Dr. Michael Greenberg—both of whom testified to the unreliability of Dr. Osinubi's methodology. Dr. Osinubi did not attend the hearing, and thus Morris's counsel was left to field questions from the District Court in relation to Dr. Osinubi's analysis.

Dr. Weed provided the District Court with multiple reasons as to why Dr. Osinubi's methodology was unreliable. For example, Dr. Weed explained that Dr. Osinubi cited a New Jersey Department of Health report for the proposition that exposure to vinyl chloride is correlated to an increased risk of liver cancer, yet neglected to mention that the report focused on a specific *type* of liver cancer, "angiosarcoma," not liver cancer in general. (*Id*. at 1983.) This oversight was then compounded by the fact that the report itself acknowledged that risk estimates were predicated on findings from chronic exposures, not the acute exposure Morris experienced. (*Id*. at 1983–84.) Citing his own research, Dr. Weed elaborated upon the relationship between angiosarcoma and vinyl chloride exposure, explaining that one could experience an increased risk of cancer only if he or she were exposed to levels of vinyl chloride much higher than the level to which Morris may have been exposed and over a much longer time frame. According to Dr. Weed, such findings were not included in Dr. Osinuibi's reports because she failed to conduct "a systematic review of any scientific evidence" and failed to explain what criteria, if any, she relied upon in reaching her conclusions. (*Id*. at 1971–75, 1980.) Dr. Weed concluded by stating that Dr. Osinubi's "causal claims [were] not based on well accepted methods" and, in his opinion, were "no more than personal subjective views,

4

devoid of validity [and] reliability." (*Id*. at 1988.) Dr. Greenberg echoed Dr. Weed's concerns as well, describing Dr. Osinubi's methodology as "faulty" and taking particular issue with the lack of "literature" available to support the notion that short-term exposure to vinyl chloride is linked to an increased risk of liver cancer. (*Id*. at 2062–64.)

Morris's counsel—who, as noted above, was left to respond to the District Court's inquiries due to Dr. Osinubi's absence—did not rebut the methodological concerns voiced by Drs. Wood and Greenberg. At one point, for instance, counsel conceded that "no study" had been done to support the notion that "short-term exposure [to vinyl chloride] causes liver cancer. . . ." (*Id*. at 2116.) Later, when pressed for an explanation as to why Dr. Osinubi failed to consider the various scientific studies cited by Dr. Weed, counsel responded by intimating that Dr. Osinubi did not review those studies because she "was never asked" to do so during her deposition. (*Id*. at 2126.)

After considering the testimony proffered by Conrail's experts and the various statements made by Morris's counsel, the District Court concluded that Dr. Osinubi's methodology failed to satisfy both Federal Rule of Evidence 702 and the *Daubert* test. In so finding, the District Court took particular note of the fact that "no explanation [had been] offered whatsoever as to the process that [Dr. Osinubi] used to come to the opinions that she expresse[d] in her reports." (*Id.* at 2155.) More specifically, the District Court explained that Dr. Osinubi "utterly failed to do any systematic research," and did not make "any effort to follow the accepted criteria in proposing medical monitoring." (*Id*. at 2155, 2157.) As such, the District Court granted Conrail's motion to exclude Dr. Osinubi's testimony.

5

Having determined that Morris could not proffer expert testimony to prove that exposure to vinyl chloride was tied to an increased risk of cancer, the District Court consequently granted Conrail's motion for summary judgment on Morris's medical-monitoring and fear-of-cancer claims. It did, however, permit Morris to proceed to trial on his negligence claim, where a jury found in Morris's favor and awarded him $500 for pain and suffering and emotional distress. After the jury returned its verdict, Conrail moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), arguing that the lack of expert testimony on the issue of medical causation precluded a finding of liability. The District Court denied the motion, prompting this timely appeal and cross-appeal.

## II.

The District Court had jurisdiction under 28 U.S.C. § 1332(a)(1). We have jurisdiction pursuant to 28 U.S.C. § 1291.

We review a district court's decision to admit or exclude expert testimony for abuse of discretion. *In re TMI Litig.*, 193 F.3d 613, 666 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000) (citation omitted). The abuse-of-discretion standard likewise applies to "the trial court's decisions about how to determine reliability" of expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 329 (3d Cir. 2002).

We "review a denial of judgment as a matter of law *de novo*, viewing the evidence in the light most favorable to the prevailing party." *Acumed LLC v. Advanced Surgical*

*Servs., Inc.*, 561 F.3d 199, 211 (3d Cir. 2009) (citation omitted). Because the parties have treated the applicable state law as that of New Jersey, we will do the same. *See id*.

III.

Morris contends on appeal that the District Court abused its discretion in deeming Dr. Osinubi's causation methodology unreliable. This argument lacks merit.

A.

Under Rule 702, the opinion of a qualified expert witness is admissible if: (1) it "will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) it "is based on sufficient facts or data;" (3) it "is the product of reliable principles and methods;" and (4) "the expert has reliably applied the principles and methods to the facts of the case." A district court, in exercising its gatekeeping function, "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. Doing so requires the district court "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

In *Daubert*, the Supreme Court identified a number of factors that district courts should consider when evaluating the admissibility of expert evidence, including: (1) whether the theory or technique applied can be tested; (2) whether the theory or technique has been subject to peer review or publication; (3) the known or potential rate of error; and (4) whether it is accepted in the relevant discipline. 509 U.S. at 593–94. In

7

examining these factors, the district court is instructed to focus "solely on principles and methodology, not on the conclusions that they generate." *Id*. at 595.

According to Morris, the District Court here "ignored the *Daubert* standard when it said it wanted 'to make sure [the defendants] in fact, caused'" the injuries that Morris alleged to have suffered. (Appellant's Br. 22) (quoting (JA 2127)). Focusing specifically on the District Court's utterance of the word "caused," Morris argues that the District Court applied a heightened standard of reliability and, in doing so, departed from its "gatekeeping function under *Daubert*." (*Id*.) Had the District Court applied the correct legal standard, Morris maintains, it would have found that Dr. Osinubi's report "easily met" the established threshold for admissibility. (*Id*. at 23.)

Contrary to Morris's assertion, the District Court duly inquired into the reliability of Dr. Osinubui's findings as required by *Daubert*. The above-cited quote does not alter this conclusion, as context makes clear that it came at the end of a seven-hour hearing and in the midst of a lengthy back-and-forth between Morris's counsel and the District Court. In fact, just prior to making this statement, the District Court paused to "make sure that [counsel] under[stood]" what was required to prove that Dr. Osinubi's methodology was reliable: "I am not attacking her opinions. I have no idea whether they're right or wrong. . . . But there has to be some showing that there was some recognized method used in arriving at the opinion." (JA 2126); *see also* (*id.* at 2118) ("So back to the question. What's the method that she used? Where is the scientific method here? Where is the explanation as to what was good evidence, what was not good evidence? And why it wasn't good evidence[?] Where is any of that in anything

8

she has written or said?").   In short, a review of the record makes clear that—contrary to Morris's contention—the District Court did not impose a heightened standard of reliability in reviewing Dr. Osinubi's medical causation methodology.

Nor did the District Court abuse its discretion when it found that Dr. Osinubi's methodology was unreliable under *Daubert*.  Indeed, counsel himself conceded that there was "no study" directly linking short-term vinyl chloride exposure to an increased risk of liver cancer.  (JA 2116.)  And as Dr. Weed explained, Dr. Osinubi did not apply a scientifically-valid methodology in rendering her general-causation opinion, as she omitted material information from her reports and failed to consider upward of forty publications that were relevant to the "question of vinyl chloride" and its causal relationship to cancer.  (*Id*. at 2031.)  By the same token, when the District Court asked Morris's counsel to explain why Dr. Osinubi disregarded this significant body of literature, counsel was unable to muster a valid response, stating simply that she "was never asked" to do so during her deposition.  (*Id*. at 2126.)  As these statements illustrate, the District Court assessed the various *Daubert* factors and plainly concluded that they had not been satisfied.

Moreover, despite Morris's protestations to the contrary, Dr. Osinubi's methodology is readily distinguishable from the methodology addressed in *Kannankeril v. Terminix International, Inc*., 128 F.3d 802 (3d Cir. 1997), *as amended* (Dec. 12, 1997). There, the plaintiffs filed suit after learning that Terminix, the pest exterminating company, had applied excessive amounts of pesticides at their residence. *Id*. at 805.  To prove that increased exposure to pesticides caused injury, the plaintiffs' expert performed

9

a "differential diagnosis" that examined, among other things, "[t]he temporal relationship" between, on one hand, the onset and nature of the plaintiffs' complaints and, on the other, the specific time at which the pesticides were sprayed. *Id.* at 808–09. On appeal, we held that the district court erred in denying the expert's testimony because the scientific community had accepted differential diagnosis as a valid methodology for proving causation, and the plaintiffs' expert specifically accounted for all relevant alternative explanations vis-à-vis the cause of injury. *Id.* at 809.

Morris argues that Dr. Osinubi, like the expert in *Kannankeril*, similarly relied upon the element of "temporal sequence" in evaluating causation, and thus it was error for the District Court to deem her methodology unreliable. (Appellant's Br. 26.) This argument is misplaced. For one—as the District Court noted—Dr. Osinubi did not apply a "differential diagnosis" like the expert in *Kannankeril*. *See* (JA 2156) (explaining that, to rely on a "temporal relationship" analysis, Dr. Osinubi was required "to show and acknowledge that [she] used a differential diagnosis," which she did not do). And second, the pesticides at issue in *Kannankeril* were known to produce "toxic effects" on humans, a fact that was "well recognized by the scientific community. . . ." *Kannankeril*, 128 F.3d at 809. Here, the opposite is true—Dr. Osinubi admitted during her deposition that there "is no literature" showing a link between short-term exposure to vinyl chloride and cancer, (JA 365), an assertion that counsel later corroborated during the *Daubert* hearing, (*id*. at 2115.) This dearth of scientific support is particularly problematic in medical-monitoring cases because, as the District Court observed, it is "inherently inconsistent to recommend medical monitoring in situations where there are no real good

10

tests to establish that someone's going to come down with one of these cancers or illnesses." (*Id.* at 2157.)

On balance, there is substantial evidence in the record to support the District Court's determination that Dr. Osinubi failed to articulate a sufficiently reliable basis for establishing medical causation. The District Court's Order granting Conrail's motion to exclude Dr. Osinubi's testimony is accordingly affirmed.[3]

B.

Conrail's cross-appeal maintains that the District Court—in the absence of expert testimony on the issue of causation—should not have allowed Morris's negligence case to proceed to trial. Under New Jersey law, however, medical causation need not be established via expert testimony so long as the plaintiff offers "objective" proof of harm at trial. *McKenna v. Pac. Rail Serv.*, 32 F.3d 820, 834 (3d Cir. 1994); *see also Lentz v. Mason*, 32 F. Supp. 2d 733, 741–42 (D.N.J. 1999). In the instant case, Morris did just that, as he testified to experiencing post-exposure injuries that were consistent with a stipulated list of symptoms that the parties tendered to the jury.

---

[3] Because we affirm the District Court's Order granting Conrail's motion to exclude Dr. Osinubi's testimony, it necessarily follows that the District Court's Order granting Conrail's motion for summary judgment must be affirmed as well, as Morris has not proffered an alternative means of recovering medical monitoring or fear of cancer damages as required by New Jersey law. *See Ayers v. Township of Jackson*, 525 A.2d 287, 312 (N.J. 1987) (holding that medical monitoring damages must be proven "through reliable expert testimony"); *see also Mauro v. Raymark Indus., Inc.*, 561 A.2d 257, 263 (N.J. 1989) (holding that a plaintiff may only recover damages for emotional distress based on exposure to toxic chemicals by establishing "a reasonable concern that he or she has an enhanced risk of further disease").

At trial, the parties introduced, among other things, the following stipulations vis-à-vis vinyl chloride exposure:

> [1.] "Vinyl chloride is a colorless gas with a mild sweet odor that is produced when the concentration in the atmosphere reaches the odor threshold."
> [2.] "The odor threshold for detection is about 3,000 parts per million PPM in air."
> [3.] "Vinyl chloride may irritate the eyes, mucous membranes and respiratory track."
> [4.] "An acute exposure to vinyl chloride may target the central nervous system."

(JA 2462–63.). The jury also viewed a factual report prepared by the National Transportation Safety Board, which stated that, after the derailment, several individuals called 911 to "report[] a chemical release and complain[] of difficulty breathing." (SA 27.)

Conrail argues that the District Court—by allowing Morris to proceed to trial on his negligence claim without expert testimony—impermissibly forced the jury to "speculate about whether Morris's exposure caused any of his particular symptoms." (Appellee's Br. 39, 41) (citing *Bushman v. Halm*, 798 F.2d 651, 659 (3d Cir. 1986) ("New Jersey precedent . . . [holds] that a jury should not be allowed to speculate on the issue of causation.")). Because New Jersey requires a plaintiff to prove causation by submitting "medical and/or scientific proof of a nexus between the exposure and the plaintiff's condition," and because such proof was not offered at trial, Conrail urges us to reverse the District Court's decision denying its motion for judgment as a matter of law. (*Id*. at 38) (quoting *James v. Bessemer Processing Co.*, 714 A.2d 898, 911 (N.J. 1998)).

12

Conrail's recital of New Jersey law, however, overlooks "[t]he key question" that we must answer in deciding whether expert testimony is necessary to prove medical causation for subjective, non-physical injuries; to wit, "whether there is evidence tending to show some objective basis for the pain." *McKenna*, 32 F.3d at 834. If objective evidence is indeed submitted, then "no expert testimony is needed because a jury is competent to decide whether there exists a causal connection." *Id*. *See also Bushman*, 798 F.2d at 658 (observing that, under New Jersey law, "a case-by-case analysis" is to be applied when determining whether "expert testimony is required to buttress" claims of subjective injury).

Here, Morris sought damages for emotional distress and pain and suffering. To prove that Conrail's negligence caused these subjective injuries, Morris testified at trial that he "tasted" the chemical while driving past the derailment scene and soon thereafter experienced eye irritation, headaches, and burning sensations on his skin. (JA 2507, 2512.) Morris also experienced dizziness while at work, and was later admitted to the emergency room, where he vomited upon arrival. (*Id*. at 2501.) Each of Morris's symptoms, in turn, was "consistent with the stipulated facts as to what vinyl chloride can cause." (*Id*. at 2546.) Thus, because Morris presented evidence of "objectively identifiable symptoms from which a jury could infer causation even in the absence of an expert witness," *McKenna*, 32 F.3d at 834, it follows that the District Court did not err in denying Conrail's motion for judgment as a matter of law.

IV.

13

For the foregoing reasons, the District Court's Orders granting Conrail's *in limine* and summary judgment motions, as well as its order denying Conrail's motion for judgment as a matter of law, will be affirmed.